AMERICAN SASH & DOOR COMPANY, a Corporation, Appellant, v. COMMERCE TRUST COMPANY, a Corporation.—56 S. W. (2d) 1034.

Court en Banc, February 8, 1933.

*James G. Smart* for appellant.

*Atwood, Wickersham, Hill & Chilcott* and *James E. Goodrich* for respondent.

104

*Montgomery & Montgomery* for Missouri Bankers Association, *amicus curiae.*

ELLISON, J.—This case was certified to this court by the Kansas City Court of Appeals, that court deeming its opinion reported in 25 S. W. (2d) 545, to be in conflict with Equitable Life Assur. Co. v. Natl. Bank of Commerce, 181 S. W. 1176, decided by the St. Louis Court of Appeals in 1916.

The plaintiff-appellant sues the defendant-respondent trust company for $2226.30, the amount of fifty certain payroll checks, which it is alleged the defendant wrongfully charged to the plaintiff's deposit account during the three months' period between September 15 and December 15, 1922, the indorsements of the payees' names having been forged on the backs of said checks, and the defendant trust company having paid the amounts thereof to persons not entitled thereto.

The defendant's answer was a general denial coupled with a plea of the affirmative defense that at the end of each of said three months it had returned to plaintiff all cancelled checks paid during the month together with a statement of the account showing all debits and credits, on which was printed a notice or stipulation that if no errors were reported in ten days the account would be considered correct. The answer avers this constituted an account stated; that the plain-

tiff negligently failed to discover and report the forged indorsements or that the checks "were in any manner incorrectly charged against the plaintiff's account," within said ten days; and further failed to report said forged indorsements within a reasonable time, as a result of which the defendant trust company was deprived of an opportunity to protect itself against loss.

The plaintiff's reply amounts to a specific denial of the allegations of the answer, except one affirmative charge that the defendant negligently failed to exercise reasonable care to ascertain the rightful owners or holders of the checks and to identify the forger to whom the checks were paid.

The cause was tried before the Circuit Court of Jackson County sitting as a jury. The only evidence offered, outside of the checks and indorsements and two letters, was the testimony of four of plaintiff's employees, this being introduced by the plaintiff. The defendant presented no evidence. At the close of the case the defendant filed a motion to dismiss and for judgment (called in the record a demurrer) which was sustained. The plaintiff requested nine declarations of law. The trial court refused seven of these, gave one, modified one, and rendered a general finding and judgment for defendant. The plaintiff appealed to the Kansas City Court of Appeals. That court reversed the judgment and remanded the cause with directions to enter a judgment for plaintiff, but certified the case to this court for the reason first above stated.

The plaintiff company had about three hundred employees. In January or February, 1922, it employed one Joseph Tschupp as payroll clerk and timekeeper. He made out the weekly payroll from certain time cards which he kept, without the use of a time clock, and turned it over to a bookkeeper, Mrs. Hubbard, who checked the same, verified the multiplications and made out checks accordingly. She delivered the checks to Mr. Simms, plaintiff's secretary and treasurer. Simms signed the checks in behalf of the corporation relying on the information thus presented to him. It may be conceded, as respondent argues, that he executed the checks "perfunctorily" but nevertheless the power to issue or not to issue was vested in him and it was by his authority alone that the checks were brought into existence. After the checks were signed Tschupp would take them to the various department heads who distributed them..

Tschupp worked for the plaintiff company practically the whole year of 1922. During the last three months of his employment he began to pad the payroll by inserting therein each week the names of persons who had not, in fact, worked for the company during the week. One of these persons was an employee named Dabney, who was engaged outside the plant and whose name did not belong on the list. Another was a nonexistent person. Five others were former employees not in the service of the company at the time. Over the

period of three months between September 15 and December 15, Tschupp fraudulently inserted one or another of the foregoing seven names in the payroll fifty times and thereby induced the bookkeeper to make out, and the secretary and treasurer, Simms, to sign, fifty checks payable to said seven persons. These checks ranged in amount from $35 to $54.10. After the payroll checks for each week had been executed by Simms, Tschupp would abstract therefrom the fraudulent checks and cash them, forging the indorsements of the payees. He testified by deposition at the trial and admitted all this, and a letter in the record states he had pled guilty and been sentenced to four years in the penitentiary.

In perpetrating these frauds Tschupp began carefully. For the first four weeks only one spurious name was added to the payroll; the fifth week, two names; the sixth week, three names; the seventh and eighth weeks, four names. For the remaining six weeks five or six names were fraudulently inserted each time. The highest amount obtained by him in any one week seems to have been about $300. The plaintiff discovered the fraud about December 20 and promptly notified the defendant trust company, making an appropriate demand. Of the fifty checks wrongfully cashed twenty-eight were presented by Tschupp to the defendant drawee bank. The other twenty-two were cashed at other banks and in due course came to the defendant bank. At least the defendant so states in its brief, saying Tschupp ''cashed checks amounting to one thousand one hundred fifty-four dollars and forty-five cents ($1154.45) at the Commerce Trust Company (the defendant) and checks totaling one thousand seventy-one dollars and ninety-five cents ($1071.95) at other banks which were later paid by the defendant.'' Furthermore, the checks with their indorsements were introduced in evidence. They bear the paid cancellation mark of the defendant bank and no intermediate indorsements, indicating they passed through no other hands and were paid direct, except, as stated above, that twenty-two of them were presented to some other bank in the first instance and thence went to the defendant.

If this conclusion is correct it means that during the week of December 1 Tschupp impersonated five different people and cashed five of the checks at the defendant trust company; and that he did the same thing the week of December 15. There is probably enough in the record to justify us in taking notice of the fact that the defendant trust company is a large institution. It had three departments, a ''Blotter Department,'' a ''Savings Department'' and the Trust Company itself. The record further shows that checks were cashed at each of these three departments, so it seems not improbable that Tschupp did impersonate five different people and cashed that many checks at the defendant trust company each of the two weeks mentioned, although there is no direct testimony on the point. Tschupp in his deposition merely said he cashed part of the fifty checks and

"caused" the others to be cashed, and he did not say *where* he cashed any of them. But in view of the admission in defendant's brief and such evidence as does appear in the record, we think the foregoing conclusion is warranted.

Other facts will be stated as necessary in the course of the opinion.

I. Although, as stated in the beginning, the defendant's answer was limited to a general denial and an affirmative plea of the plaintiff's failure to complain of the cashing of the checks after the return of the cancelled vouchers and bank statement each month, nevertheless, in the trial court and in this court the cause was presented on the theory that three defenses were and are available to the defendant: (1) that the plaintiff was guilty of negligence in the *issuance* of the checks, in that it failed to maintain a proper payroll system and to thwart the fraud of its faithless employee Tschupp in procuring the checks to be made out; (2) that the guilty knowledge and intention of Tschupp that the payees in said checks should have no interest in them was imputable to his principal, the plaintiff company, and thereby made the payees fictitious, in consequence of which the checks were payable to bearer by force of Section 2638, Revised Statutes 1929; (3) that the plaintiff failed to complain of the cashing of the checks after they had been returned, as aforesaid. The first of these defenses—that the plaintiff was guilty of negligence in the issuance of the checks—is affirmative, and is not tendered by the answer; but inasmuch as the trial and appellate theory of both parties embraces all three defenses we shall consider them here.

II. Another preliminary question to be determined is, on what theory did the trial court decide the case? The record proper shows that the cause was tried on July 5, 1927, and taken under advisement; and that six days later on July 11, the defendant filed a "demurrer." The bill of exceptions states that on said date, July 11, "the defendant filed its demurrer . . . the said demurrer so offered on behalf of the defendant is in words and figures following, to-wit:

"'Now comes the above named defendant at the close of all the evidence and moves the court to dismiss plaintiff's petition and render judgment herein in favor of the defendant.'

"Which demurrer, so prayed by the defendant, the court afterwards sustained; and to which action and ruling of the court, in sustaining the same, the plaintiff at the time duly excepted and still excepts."

Immediately following the foregoing the bill of exceptions states that after the close of all the evidence, the plaintiff requested the court to give declarations of law numbered 1, 2, 3, 4, 5, 6, 7, 8 and 9, which are set out. It is recited that the court refused all these

declarations except No. 8, which was given, and No. 9, which was modified and given. The bill goes on to say that the plaintiff duly excepted to the refusal and modification of said declarations, and then recites "and to the action and ruling of the court in sustaining the defendant's demurrer and motion to dismiss the plaintiff's petition, the plaintiff at the time duly excepted and still excepts."

The bill of exceptions does not disclose the date on which the so-called demurrer was overruled or the date on which said declarations of law were rejected, but immediately following the last recital aforesaid states (and the record proper shows the same thing) that "afterward" on January 7, 1929, the cause having theretofore been submitted to the court on the pleadings, evidence and proof adduced, and having been by the court taken under advisement, the court "finds the issues in favor of the defendant, wherefore it is ordered and adjudged by the court that the plaintiff take nothing by its action herein and that the defendant go hence without day. . . ."

From what is stated above it will be seen the record shows a motion called a demurrer was filed and overruled, but that the trial court also gave certain declarations of law and refused others, and after the cause was submitted "upon the pleadings, evidence and proof adduced," rendered a general finding and judgment in favor of the defendant. Does this all mean that the court sustained a demurrer to the plaintiff's evidence or that it made a finding and judgment for the defendant on the weight of the evidence? The question is important in the determination of this appeal. We think and hold the record should be interpreted as meaning that the trial court sustained a demurrer to the plaintiff's evidence.

As stated, the only evidence introduced was that offered by the plaintiff. Again, the first point in plaintiff-appellant's brief is that the trial court "erred in sustaining defendant's motion in the nature of a demurrer to the evidence." The defendant-respondent says in its brief "the case was tried before the court, and at the conclusion of the plaintiff's case the defendant also rested, offering no evidence, and the court sustained defendant's demurrer and rendered judgment in favor of the defendant." In its reply brief the defendant further says "the defendant asked a declaration of law or motion in the nature of a demurrer to the evidence which was given." All these briefs are the briefs which were filed by the parties in the Kansas City Court of Appeals, and on which the cause was submitted when it was argued in Division Two of this court. After an opinion had been written in that Division both parties filed supplemental briefs and the cause was submitted to the court en banc. In its supplemental brief the plaintiff-appellant repeats the assignment that the trial court erred in "giving defendant's motion in the nature of a demurrer;" and in the respondent's supplemental brief written and filed after the service of the plaintiff's supplemental brief, the

fact that the trial court sustained a demurrer to the evidence is not challenged.

In view of the fact that the so-called demurrer or motion is ambiguous, we think the recitals in the record and the admissions of the parties in their briefs should be taken as conclusive that the cause was ruled in the trial court on a demurrer to the evidence. The fact that the court rendered a general finding and judgment does not necessarily mean that the trial court weighed the evidence; it may just as well mean that, taking all the plaintiff's evidence as true, the plaintiff had no case.

Neither does the fact that declarations of law were requested by the plaintiff and refused, given or modified by the court, signify the court decided the case on the weight of the evidence. On the contrary these declarations show the theory on which the court decided the plaintiff's evidence failed to make a case. For instance, declaration of law No. 2 said that the defendant trust company could pay money out of the plaintiff's deposit account only on the latter's authentic demand or order, and that the plaintiff was entitled to recover "unless the court finds from the evidence that plaintiff was guilty of negligence, and that such negligence was the direct or proximate cause of such payments." The court refused this declaration indicating it thought the defendant was not liable even though the plaintiff's negligence had not been the cause of the payments.

Again, declaration No. 4 said that the guilty knowledge of Tschupp of his own acts in padding the payroll, procuring the issuance of the checks and cashing the same could not "as a matter of law, be imputed to plaintiff." The court refused this declaration, indicating it thought Tschupp's knowledge and intent could be imputed to his principal, the plaintiff, *as a matter of law*.

Likewise declaration No. 6 declared in substance that even if the court should find the plaintiff failed to exercise reasonable care to examine the cancelled checks and bank statements after their return from the defendant, thereby causing a delay in the discovery of the forgeries and in giving notice thereof to the defendant, still these facts would not prevent the plaintiff from recovering if the court further found that defendant had been guilty of negligence in the first instance by failing to use reasonable care to ascertain the persons rightfully entitled to payment of the checks when they were presented. The court refused this declaration indicating it thought the defendant trust company's negligence, if any, would not destroy its defense.

And finally, the trial court's theory seems to be clearly shown by modified declaration No. 9. The first three lines show the declaration as requested; the underscored part was added by the court:

"The court declares the law to be that plaintiff was not presumed to know the signatures of the payees endorsed upon the checks offered in evidence. *As a general proposition of law, makers of checks*

*are not presumed to know the signatures of the payees but plaintiff having issued these checks to fictitious, and, or, non-existing persons, and knowing such fact at the time of the issuance, there is no room for a presumption such as is requested in this declaration."*

From the modification it is at once apparent that the court held the plaintiff *knew* the payees in the several checks were fictitious or nonexisting persons. And as it unequivocally appeared from the testimony that Tschupp's fraud was actually known only to Tschupp, himself, the necessary effect of the court's modification was to hold that Tschupp's guilty knowledge was imputable to the plaintiff and binding on it as a matter of law.

But while, as we say, it appears to us the trial court decided the case for defendant on defendant's second defense, that is to say, on the theory that the plaintiff had constructive or imputed knowledge that the checks were payable to fictitious persons thereby making them payable to bearer under the statute, nevertheless we shall follow the trial and appellate theories of the parties and refer to the other defenses argued in the briefs.

■ III. Considering first the defense that the plaintiff was negligent in the *issuance* of the checks. By the overwhelming weight of authority the negligence of a depositor which will relieve the drawee bank from cashing on a forged indorsement his check delivered to one person but made payable to the order of another, must be such as relates to the forgery or its detection and the payment of the check, not to the mere mistaken issuance thereof. The relation between the bank and the depositor is that of debtor and creditor. The bank's duty to make charges against the depositor's account only on his authentic order and genuine indorsements is absolute—contractual. It is not simply a question of using due care and of offsetting negligence against contributory negligence. To be available as a defense the negligence of the depositor must be of such nature as to interfere with the bank's performance of its contract, and in effect amount to a representation operating as an estoppel. The statement made in Jordan Marsh Co. v. Natl. Shawmut Bank, 201 Mass. 397, 407, 408, 87 N. E. 740, 22 L. R. A. (N. S.) 250, a leading case on the question, is that the "negligence of the maker is immaterial unless it is of a kind that directly and proximately affects the conduct of the banker in the performance of his duties;" and further, "it seems plain that only negligence which is a direct and proximate cause of the payment can be effectual in making such a defense." This language has been quoted in many subsequent decisions.

In E. St. L. Cotton Oil Co. v. Bank of Steele, 200 Mo. App. 180, 188, 205 S. W. 96, 99, it is said: "The negligence of the defendant (plaintiff) should have some connection with the forgery or the act of the bank in paying the check. In other words the negligence of the customer or drawer should be the proximate cause of the forgery

or payment, and not the mere possible cause of the forger getting possession of the blank check (citing the Jordan Marsh case, supra). Where the customer is directly connected with the forgeries or his negligence is directly connected therewith, he cannot recover." [See, also, Miners' & Merchants' Bank v. St. L. S. & R. Co. (Mo. App.), 178 S. W. 211, 212.]

In Welsh v. German-American Bank, 73 N. Y. 424, 429, where a swindling bookkeeper imposed upon his employer, as Tschupp did upon the plaintiff in this case, by procuring the issuance of checks for amounts falsely represented to be due third parties, and then forged the indorsements of the payees and cashed the checks, the court said: "The fraud committed upon the plaintiff and upon the bank were independent and unconnected frauds."

And in New Amsterdam Casualty Co. v. Albia State Bank, 242 Iowa, 538, 239 N. W. 4, 8, the Supreme Court of Iowa observes: "It has been held that even a negligent delivery of a check to a person other than the payee is not the proximate cause of the loss sustained by the drawee bank cashing the same upon a forged indorsement and for the reason that there are two intervening causes of loss: first, the forgery by the wrongdoer, and second, the negligence of the bank in cashing the check."

The doctrine of the foregoing decisions is in accord with the rulings in many jurisdictions in this country: Los Angeles Inv. Co. v. Home Sav. Bank, 180 Cal. 601, 610, 182 Pac. 293, 5 A. L. R. 1193; Union Tool Co. v. F. & M. Natl. Bank, 192 Cal. 40, 46, 218 Pac. 424, 28 A. L. R. 1417; U. S. C. S. Co. v. Cent. Mfg. Dist. Bank, 343 Ill. 503, 513, 175 N. E. 825, 74 A. L. R. 811; McCornack v. Central State Bank, 203 Iowa, 833, 841, 211 N. W. 542, 52 A. L. R. 1297; United Workmen v. State Bank of Winfield, 92 Kan. 876, 888, 142 Pac. 974, L. R. A. 1915B, 815; City of St. Paul v. Merchants' Natl. Bank, 151 Minn. 485, 488, 187 N. W. 516, 22 A. L. R. 1221; Shipman v. Bank S. N. Y., 126 N. Y. 318, 27 N. E. 371, 22 Am. St. Rep. 821, 12 L. R. A. 791; Seaboard Natl. Bank v. Bank of America, 193 N. Y. 26, 32, 85 N. E. 829, 22 L. R. A. (N. S.) 499; Natl. Surety Co. v. Manhattan Co., 252 N. Y. 247, 256, 169 N. E. 372; Armstrong v. Pomeroy Natl. Bank, 46 Ohio, 512, 519, 22 N. E. 866, 6 L. R. A. 625, 15 Am. St. Rep. 655; Natl. Bank of Commerce v. Fish, 67 Okla. 102, 169 Pac. 1105, L. R. A. 1918F, 278; Joseph Milling Co. v. First Bank, 109 Ore. 1, 19, 216 Pac. 560, 29 A. L. R. 358; Guaranty State Bank & T. Co. v. Lively, 108 Tex. 393, 398, 194 S. W. 937, L. R. A. 1917E. 673; N. Y. Produce Ex. Bank v. Houston, 169 Fed. 785, 788.

The only decisions we have been able to find announcing a contrary doctrine on this question are the three next mentioned. In C. E. Erickson Co. v. Iowa Natl. Bank, 211 Iowa, 495, 230 N. W. 342, 344, the facts were similar to those here but more aggravated. The plaintiff company's payroll clerk fraudulently caused its treas-

urer to issue 479 of its special payroll checks payable to former employees through a period exceeding three years. These were delivered to the clerk for distribution. He forged the indorsements of the payees thereon and added his own. The case, without citing any of the authorities referred to in the preceding paragraph, holds the act of the treasurer in issuing the checks amounted to a representation that the payees were employed by the company, and says: "If the drawee-bank in paying the check reasonably believed that the payee was a present employee *it might also reasonably believe that the indorsement was genuine.*" (Italics ours. How the fact that the payee in a check was an employee could *identify* the person indorsing or presenting it for payment, is more than we can see.) The opinion further reasons that if the frauds had been discovered the forgeries would have been stopped, or stopped sooner; and is partly based on the theory that the frauds were long protracted and that the plaintiff should have detected them especially since the swindling clerk was indorsing his own name on the checks all of which were returned with the monthly bank statements. The lower court had directed a verdict for the plaintiff. The Iowa Supreme Court held the case should have been submitted to the jury.

In Kaszob v. Greenebaum Sons Bank & Trust Co., 252 Ill. App. 107, a payroll clerk fraudulently induced the issuance of 468 checks over a period of nineteen months. The indorsements of the payees were forged by the clerk and he cashed the checks. It was held that in view of the long continuance of the practice and the fact that the bank returned the checks monthly with its statements, the question of the plaintiff's negligence was for the jury. This case is not in harmony with the later controlling decision of the Illinois Supreme Court in U. S. C. S. Co. v. Cent. Mfg. Dist. Bank, 343 Ill. 503, 175 N. E. 825, 74 A. L. R. 811.

In Detroit Piston Ring Co. v. Wayne Co. & H. S. Bank, 252 Mich. 163, 233 N. W. 185, 75 A. L. R. 1273, a trusted payroll clerk procure l the execution of 567 wage checks aggregating nearly $34,000 through a period of two years seven months. All of these she cashed by forging the names of the payees, but without signing her own name. The increased outlay added so heavily to operating expenses that a survey was made of the company's accounting system, but the payroll was not canvassed or the fraudulent checks discovered. The Michigan Supreme Court held in harmony with the long line of cases cited above that negligence of a depositor in issuing checks is no defense to the banker for paying them on forged indorsements. The opinion of the Kansas City Court of Appeals in the instant case is cited approvingly. The Erickson case from Iowa and the Kaszob case from Illinois, referred to in the preceding two paragraphs, are mentioned and the former quoted and discussed. As we understand the opinion the Michigan court disapproves of both. But the court further says

"a depositor may not sit idly by, however, after knowledge has come to him that his funds seem to be disappearing or that there may be a leak in his business. . . ." The plaintiff had a directed verdict. The Supreme Court reversed and remanded the cause for trial to a jury.

The defendant-respondent cites and relies on Land Title & Trust Co. v. N. W. Natl. Bank, 196 Pa. 230, 234, 46 Atl. 420, 79 Am. St. Rep. 717, 50 L. R. A. 75. It is not in point. The essential facts there were that an imposter, A, posing as B, fraudulently induced the plaintiff trust company to give him its check payable to B, the trust company believing A to be B. A forged B's indorsement and caused the check to be cashed at the defendant bank. When the fraud was discovered the trust company sued the bank and recovery was denied. But the distinguishing feature of the case is that the trust company intended A, the very person to whom it delivered the check, should get the money (though deceived as to his identity). The decisions are not in harmony as to who should bear the loss even in that situation, 22 American Law Reports, page 1228, note, but whatever the correct rule may be, the case is not authority where the facts are— as they are in the instant case—that the maker in good faith entrusted the check to one person for transmission to another, making it payable to that other with the intent that the latter should receive the money. This is expressly pointed out in R. E. Land Title & Trust Co. v. U. S. Security Trust Co., 303 Pa. 273, 278, 154 Atl. 593, 594, decided last year (1931). [See, also, McCornack v. Central State Bank, supra, 203 Iowa, l. c. 838, 211 N. W. 542, 52 A. L. R. 1297.]

Clearly, the facts of this case furnished no warrant for holding as a matter of law (if the trial court did so hold) that the plaintiff was negligent in the issuance of the checks. Tschupp's peculations covered only a comparatively short period of three months; there is no evidence that the plaintiff had any reason to doubt his honesty, before the event; the system in force in the plaintiff's plant required its payroll operations to pass through the hands of at least four people before payment was made; and the increased expense due to the fraudulent checks was evidently only a small proportion of the total payroll outlay. Furthermore, the issuance of the checks was not the proximate cause of the payment thereof on forged indorsements to Tschupp, or his confederates if any. As to this defense, it is our opinion that the Kansas City Court of Appeals correctly held the finding should have been for the plaintiff.

IV. The second defense urged by the trust company is that the fifty checks were in law payable to bearer because they were made out to fictitious payees, that is to say, to one nonexistent person and six former employees who were not entitled to them or intended by Tschupp to receive them. For this reason it is contended the defend-

ant bank had a right to cash the checks regardless of the indorsements, and is therefore not liable. This is the point on which we think the trial court decided the case.

Section 2638, Revised Statutes 1929, provides, in part, as follows: "The instrument is payable to bearer: . . . (3) when it is payable to the order of a fictitious or non-existing person *and such fact was known to the person making it so payable.*" (Italics ours.) It is said this was the rule at common law, or at least under the case law before the adoption of the Negotiable Instruments Act, Brannan's Negotiable Instruments Law (5 Ed.) p. 189; 8 C. J. sec. 305, p. 179. The law further is well established that the payee named in an instrument will be deemed fictitious though designating an existing person, if there was no intent he should have a beneficial interest in the paper. [8 C. J. sec. 305, p. 180.] ■ So, under our statute two questions arise: (1) who was the "person" in this case that made the fifty checks payable to the payees therein designated, and whose intention must be consulted in determining whether the payees were fictitious—was it Tschupp, the fraudulent payroll clerk, or Simms, the secretary and treasurer who signed the checks, or the plaintiff corporation acting by and through one or the other of these agents; (2) and did the "person" making the checks so payable *know* the payees were fictitious—that is to say, if the plaintiff was the person who in the statutory sense made the checks payable as they were, is it bound by the guilty knowledge and intent of its faithless clerk, Tschupp, who alone knew of the fraud, or is it protected by the innocence of its treasurer Simms, who alone did and had authority to execute the checks?

The Kansas City Court of Appeals in its opinion followed Mueller & Martin v. Liberty Ins. Bank, 187 Ky. 44, 48, 218 S. W. 465, 467, and held the "person" meant by the statute is not the maker of the paper but the individual person who actually drew it, in this case, Simms. The defendant trust company contends the statute refers to the maker of the instrument—in this case the plaintiff corporation—and that the guilty knowledge of Tschupp is imputable to the plaintiff. The trial court so ruled. We think both conclusions are wrong: that the word "person" used in the statute means the maker of the paper, but that the plaintiff here is not bound by the guilty knowledge of Tschupp because it was not within the actual, implied or apparent scope of his employment to execute checks, as a matter of fact in this instance he did not do so, and the defendant bank did not deal with him on that basis.

On the first proposition, it is said in 3 Ruling Case Law, section 66, page 881: "The maker's intention is the controlling consideration which determines the character of such paper. It cannot be treated as payable to bearer, unless the maker knows the payee to be fictitious, and actually intends to make the paper payable to a

fictitious person.'' Seaboard Natl. Bank v. Bank of America, 193 N. Y. 1. c. 33, 85 N. E. 829, 22 L. R. A. (N. S.) 499, declares: ''Such intention to be effective must necessarily arise from knowledge and exist as an affirmative fact in the mind of the drawer of a draft at the time of its delivery.'' Phillips v. Mercantile Natl. Bank, 140 N. Y. 556, 561, 35 N. E. 982, 37 Am. St. Rep. 596, 23 L. R. A. 584, says the rule applies ''only when such paper is put into circulation by the maker with knowledge that the name of the payee does not represent a real person,'' and again that it ''does not depend upon the identification of the name of the payee with some existent person, but upon the intention underlying the act of the maker in inserting the name.'' Obviously, it is the intention of the responsible creator of the paper which governs.

But—on the second proposition—when the agent or employee who drew the check had authority from the maker to execute checks, it is held in several cases the maker will be bound by his knowledge and intention (though secret and fraudulent) and the check will be payable to bearer if made out to a person not intended by him to receive it. In other words, the act and intent of the agent in drawing the check becomes the act and intent of the principal. Some of these decisions base their conclusion at least in part on the theory that by thus empowering the agent, the maker holds him out to the bank as having authority to draw checks in the form presented. [The cases so holding are Norton v. City Bank & Trust Co., 294 Fed. 839, 844; Bartlett v. First Natl. Bank, 247 Ill. 490, 498, 93 N. E. 337; Snyder v. Corn Exch. Natl. Bank, 221 Pa. 599, 605, 70 Atl. 876, 128 Am. St. Rep. 780; Mueller & Martin v. Liberty Ins. Bank, 187 Ky. 1. c. 44, 49, 218 S. W. 465, 468; Phillips v. Mercantile Natl. Bank, 140 N. Y. 556, 35 N. E. 982, 37 Am. St. Rep. 596, 23 L. R. A. 584; Hackensack Trust Co. v. Hudson Trust Co., 197 N. Y. Supp. 158, 119 Misc. 689.]

When, however, the agent or employee has no such authority and does not execute the checks, but merely fraudulently induces his principal to issue them to others in good faith, the rule is otherwise, and the maker is not bound by the guilty knowledge of his employee. This distinction is expressly drawn in Phillips v. Mercantile Natl. Bank, supra, cited by respondent, and is further pointed out or made apparent in the following decisions, in all of which the facts are closely parallel to those of the case at bar. [Jordan Marsh Co. v. Natl. Shawmut Bank, 201 Mass. 1. c. 408, 87 N. E. 740, 22 L. R. A. (N. S.) 250; Shipman v. Bank S. N. Y., 126 N. Y. 1. c. 330, 27 N. E. 371, 22 Am. St. Rep. 821, 12 L. R. A. 791; Seaboard Natl. Bank v. Bank of America, 193 N. Y. 1. c. 32, 85 N. E. 829, 22 L. R. A. (N. S.) 499; City of St. Paul v. Merchants' Natl. Bank, 151 Minn. 1. c. 488, 187 N. W. 516, 22 A. L. R. 1221; Los Angeles Inv. Co. v. Home Sav. Bank, 180 Cal. 1. c. 610, 182 Pac. 293, 5 A. L. R. 1193; U. S. C. S. Co. v.

Cent. Mfg. Dist. Bank, 343 Ill. l. c. 507, 175 N. E. 825, 74 A. L. R. 811, 822, note.]

The further contention is made by the defendant trust company in the present case that since Tschupp was authorized to make up the payroll, therefore, when he made a false payroll he was acting in the scope of his authority and in line with the reasoning of the above decisions bound the plaintiff by his guilty knowledge and intent. But that is another matter. The padding of the payroll was not the proximate cause of the *cashing* of the checks indorsed as they were. In determining whether the checks were payable to bearer under our statute, we are not concerned with Tschupp's authority in the company's other activities, but solely with his agential powers in the execution of checks; and as to that he had none.

Can it be the law that where a company has hundreds of employees severally engaged in its multiform activities, specific knowledge possessed by any one of them within the scope of his particular employment will be imputed to the company throughout the entire field of its operations and as affecting disconnected matters in charge of other employees not similarly advised? In answer it may be said making up a payroll is not disconnected but closely related to the matter of paying the wages called for thereby. But they are different functions and different in their causal effect, as this case illustrates. Authority is often divided in such concerns, one set of employees or officers making up requisitions and another scrutinizing and paying them for the very purpose of preventing frauds.

Speaking on this point, and referring to the cases cited a few paragraphs back in this opinion which hold that when the faithless employee has authority to draw checks his guilty knowledge in executing them will be imputed to his principal, the Supreme Court of Illinois in the recent case of U. S. C. S. Co. v. Cent. Mfg. Dist. Bank, supra, 343 Ill. l. c. 512, 175 N. E. 825, 74 A. L. R. 811, said the decisions so holding all "were based upon the general authority of the officers or agents drawing the instruments in those cases to indorse such instruments and bind their principals." The opinion then continues:

"The converse of the rule, that without such general authority the intention of the agent is not binding on the principal, is equally true. It is unreasonable that the intention of the corporation or the partnership or the individual employer should be sought for in the intention of any subordinate employee who has no authority to issue a check, draft or other negotiable instrument. There may be many employees—shipping clerks, messengers, checkers, bookkeepers, superintendents, managers of departments and others—whose duties are necessarily concerned in the receipt, care, sale and delivery of goods, in the doing of work, in the keeping of accounts and in the determination of the amounts due from debtors or to creditors of any mercantile manufacturing or commercial establishment, whose work

is all subject to the final control of the responsible officers to whom are committed the duty and responsibility of direction, final decisions and action.''

■ Along this line it is further suggested in behalf of the defendant trust company that the *delivery* of checks is a part of their execution—of their ''making'' in the language of the fictitious name statute, supra—and that in this case Tschupp delivered the checks after they had been signed by Simms, the secretary and treasurer. The suggestion is that since Tschupp had authority to deliver the checks he had a responsible part in their creation, as much as Simms who signed them, by reason of which his guilty knowledge would be imputable to the plaintiff on the theory of the cases referred to above. But this contention, if otherwise well grounded, cannot stand for two reasons. In the first place, as we have shown in our statement of the facts, Tschupp did not, and had no authority to, utter the checks. He merely carried them back to the various departments, where they were delivered to the employees. In the second place, as is held in several of the cases cited where the employee was entrusted with the delivery of the checks to the payees, Tschupp had no discretion about the matter—no power to determine whether the checks should or should not be delivered. He was a mere conduit. As is held in the Illinois case last quoted from, 343 Ill. l. c. 520, 175 N. E. 825, 74 A. L. R. l. c. 822, ''his intention not to deliver them could not be imputed to his employer any more than the intention of any other messenger it might employ—an expressman, or a district messenger boy, or a special messenger.'' This is in harmony with the general rule that ''notice to or knowledge of a mere ministerial agent, clerk, or servant will not be imputed to the principal.'' [2 C. J. sec. 544, p. 865; Royle Mining Co. v. Fid. & Cas. Co., 161 Mo. App. 185, 198, 142 S. W. 438, 443.]

The defendant bank relies strongly on Bank of England v. Vagliano Bros., Law Reports Appeal Cases, 1891, 3 Eng. Rul. Cas. 695, where the essential facts were as follows. One Glyka, a correspondence clerk in the office of the plaintiff Vagliano Bros., over a period of seven months skillfully forged 43 bills of exchange aggregating nearly $350,000, purporting to be drawn on his employers by one of its regular correspondents, Vucena, a merchant in Russia, payable to C. Petridi & Co. of Constantinople at the Bank of England. He further fraudulently induced the employer to indorse its genuine acceptance on the bills, and by the same means caused these fraudulent drafts to be listed in a letter of advice sent by the firm to the bank each month indicating the bills it had accepted which would be presented for payment during that month. Glyka forged the indorsement of the payees and cashed the bills at the bank.

In a suit brought by Vagliano Bros. against the bank, the English court of original jurisdiction held the plaintiff entitled to recover.

[22 Q. B. D. 103.] The Court of Appeal took the same view and the bank's appeal was dismissed (23 Q. B. D. 243). But the House of Lords reversed the judgment by a divided vote, on these two main grounds: (1) that by indorsing its genuine acceptance on the forged bills, and sending its letter of advice to the bank that the bills had been accepted and would be presented for payment during the month, the plaintiff affirmatively encouraged the bank to believe them genuine and to relax the vigilance it otherwise would have exercised; (2) that under the English statute, which provides merely, "where the payee is a fictitious or non-existing person the bill may be treated as payable to bearer," and omits the further requirement appearing in our statute that "such fact was known to the person making it so payable," the bills were payable to bearer notwithstanding Vagliano brothers did not know the payee was a fictitious person. Ever since the rendition of this decision the English statute has been construed as dispensing with the common-law requirement of *knowledge* on the part of the maker, and as leaving the character of the paper—whether payable to bearer or not—to depend solely on the fact whether the payee was nonexistent or fictitious. [8 C. J. sec. 305, p. 180.]

It will be seen at once the facts of this Vagliano case differentiate it from the case at bar. Generally it has not been followed in this country. The decision of the English Court of Appeal therein, 23 Q. B. D. 243, which was directly contrary to the final conclusion of the House of Lords, was cited approvingly in Armstrong v. Pomeroy Natl. Bank, supra, 46 Ohio, l. c. 524, 22 N. E. 866, 6 L. R. A. 625, 15 Am. St. Rep. 655, before the latter decision came out. And soon after the judgment and opinions of the House of Lords were reported, the case was repudiated as authority, or more correctly, distinguished on its facts, in Shipman v. Bank S. N. Y., 126 N. Y. l. c. 333, 27 N. E. 371, 22 Am. St. Rep. 821, 12 L. R. A. (N. S.) 791. It is said in 74 American Law Reports, 832, note, the reason for the difference in the rulings of the English and American courts on this question is to be found in the dissimilarity of their statutes, as already pointed out.

The instant case was certified to this court by the Kansas City Court of Appeals as being in conflict with Equitable Life Assur. Soc. v. Natl. Bank of Commerce, 181 S. W. 1176, decided by the St. Louis Court of Appeals. In that case an agent of the plaintiff insurance company by fraud induced the company to issue its policy on the life of W, a nonexistent person, in favor of the wife of the insured, also nonexistent. A few months later the agent fabricated proofs of death and obtained from the company its check for the amount of the claim, payable to the supposed wife. It was the agent's duty to deliver the check to her on surrender of the policy and execution of a receipt. The agent caused the indorsement of the payee to be forged and introduced a conspirator to a local bank as a close relative

of the wife authorized to receive the money. By this means the check was cashed and in due course reached the defendant drawee bank where it was charged to the insurance company's account. On discovery of the fraud the plaintiff company sued the bank and the St. Louis Court of Appeals denied a recovery, holding the agent acted within the scope of his authority when he delivered the check and induced its payment in the circumstances narrated; and that the check became payable to bearer under our statute because the plaintiff was bound by the agent's knowledge that the payee was nonexistent. One of the judges dissenting, the case was certified to this court where the judgment was affirmed on technical grounds without determination of the above question. [197 S. W. 118.]

The Kansas City Court of Appeals deemed the St. Louis appellate court's holding that knowledge of an agent for the delivery of a check of the nonexistence of the payee makes the check payable to bearer, to be in conflict with its own holding in this case that such knowledge must be possessed by the individual person actually drawing the check. Brannan's Negotiable Instruments Law (5 Ed.), page 187, vigorously assails the St. Louis case and upholds the ruling of the Kansas City appellate court in this case.

■ Earlier in this opinion we have held the language of our statute, ''the person making it so payable,'' refers to the legal or ultimate maker of the check. Ordinarily, the maker would do everything necessary to give the check validity—that is, he would both draw it and deliver it. The reason underlying the statute is said to be that when a negotiable instrument is made payable to a nonexistent or fictitious person there is no one to indorse it, and hence, if the maker intended to give it currency it could only be on the theory that it becomes payable to bearer. The knowledge and intent of the maker in putting the check in circulation would therefore be pertinent; Shipman v. Bank of State of N. Y., 126 N. Y. l. c. 330, 27 N. E. 371, 22 Am. St. Rep. 821, 12 L. R. A. 791; Harmon v. Old Detroit Natl. Bank, 153 Mich. 73, 79, 116 N. W. 617, 126 Am. St. Rep. 467, 17 L. R. A. (N. S.) 514; and if a maker should draw a check not knowing the payee to be nonexistent or fictitious, but should nevertheless utter it after learning that fact, we should say the check would be payable to bearer. Similarly, if one authorized officer of a corporation—say—should thus innocently draw the check, and another officer with discretionary power to deliver should put the check into circulation knowing the payee to be fictitious or nonexistent, it would seem the same result should follow. That, in effect is what the Equitable case, supra, decided by the St. Louis Court of Appeals holds.

But the decision is not authority here. For, where the authorized officer of the corporation draws the check in ignorance of the fact that the payee is fictitious or nonexistent, and the check

is put in circulation by an employee acting outside the scope of his authority, the statute does not apply and the check is not payable to bearer because in such circumstances the corporation would be without either actual or constructive knowledge of the fictitious status of the payee. Such are the facts of this case. No considerations of the maker's negligence or of the rights of innocent purchasers enter into the problem because the checks on their face were payable to designated persons and the defendant trust company did not cash them on any other theory. The question is solely one of the application of the statute and of the law of agency.

In the instant case the Kansas City Court of Appeals held, 25 S. W. (2d) l. c. 548: "It is well settled that the rule that notice to the agent is notice to the principal does not apply where the agent is engaged in a scheme to defraud the principal." The respondent vigorously assails that statement, citing Gleason v. Seaboard Air Line Ry. Co., 278 U. S. 349, 49 Sup. Ct. 161, 73 L. Ed. 415. The Gleason case in substance rules that where one is defrauded by an agent acting in the real or apparent scope of his authority, the principal is liable under the broad doctrine of the maxim *respondeat superior,* notwithstanding the principal was in fact ignorant of the agent's misconduct and the latter sought to enrich himself. But conceding for argument's sake all that is true, it has no application to this case because Tschupp had neither real nor apparent authority to execute or cash checks and the defendant trust company did not deal with him on any such basis.

Instead of the plaintiff's being bound as a matter of law by the guilty knowledge and intent of Tschupp—as the trial court ruled—we hold the conclusion (but not the reasoning) of the Kansas City Court of Appeals to the contrary was correct on the admitted facts, and that the checks were not payable to bearer.

V. The third defense in the case raises this question. The monthly statements returned by the defendant trust company with plaintiff's cancelled checks for each month, including the fifty fraudulent checks involved in this case, had printed thereon the following: "Please examine this statement at once and report any error. If no error is reported in ten days the account will be considered correct. The items are credited subject to final payment." As heretofore stated, the fraud of Tschupp was not discovered by the plaintiff corporation until about December 20. In the meantime the bank statements with cancelled checks for September, October and November had come in.

It is contended by the trust company that the failure of the plaintiff to go over the cancelled checks, detect the forged indorsements thereon or the wrongful issuance thereof, and to make complaint within the designated ten days or within a reasonable time, estops it from holding the bank responsible on the checks paid. Even if this is true

it would not apply to the checks issued and paid in December, for the fraud as to these had been discovered before the statement was rendered. Furthermore, as the opinion of the Kansas City Court of Appeals holds, the plaintiff was not bound as a matter of law to know the true signatures of its employees and to be able to detect the forgeries. Prima facie when the plaintiff examined the checks each month as they were returned if there was nothing appearing on the face of them to put a reasonably prudent person on inquiry, the plaintiff was not guilty of negligence. Checks put into circulation often pass current through many hands and the drawer is not expected to verify the indorsements. On the other hand, the bank by the simple expedient of requiring the last indorser to be identified and responsible, can protect itself. This is established by many authorities including some of those cited throughout this opinion.

We will not say the maker never is required to look at the indorsements. If, as in the Erickson case, supra, 211 Iowa, 495, 230 N. W. 342, the fifty checks had been further indorsed by Tschupp personally, showing all the money was going to or through him; if, as in the Detroit Piston Ring Co. case, supra, 252 Mich. 163, 233 N. W. 185, 75 A. L. R. 1273, the expense of the company had so unduly increased as to attract attention; if the plaintiff had known of part of the forgeries and failed to caution the trust company; if the forged indorsements had even been crude and obviously all in the same handwriting—in any of these circumstances we will concede *arguendo* there might be substance to this defense. But the defense was affirmative; no such facts were shown; and we can see nothing in the record presented sufficient to excuse the bank from the legal consequences of its wrongful act in cashing the checks on forged indorsements and paying the money to parties not entitled thereto.

The defendant trust company made no effort to sustain its affirmative defenses by proof. It failed to produce as witnesses its officers and employees who had handled the checks and to show what care was exercised in cashing them, or that it had been misled by any act of commission or omission on the part of the plaintiff. It failed to show wherein or why the plaintiff should have discovered the checks were wrongfully cashed and made complaint.

Suggestion is made on behalf of the defendant that even if, as the great weight of authority holds, the plaintiff was not bound to know the signatures of the indorsers on its checks, yet it should have known who were in its employ, and when it discovered the checks were made out to and apparently cashed by persons no longer in its service, an investigation should have been started. The further fact is stressed that D. W. Dabney, one of the payees in the checks, was working outside the plant and paid in a different manner, which fact was known to Simms, the secretary and treasurer who signed the checks; and that in these circumstances Simms should have in-

tercepted these Dabney checks when they were presented to him, or should have discovered the fraud when they were returned cancelled.

The answer to this is that Simms testified he signed checks "by the hundred," relying on the payroll information presented to him by Tschupp; and that he was in fact misled by Tschupp and did not detect the frauds. This fact must be taken as true in ruling on a demurrer to the plaintiff's evidence; and there is no substantial dispute about it, the defendant contending the plaintiff was bound by Tschupp's knowledge and Simms' *negligence*. Simms' negligence in the *issuance* of the checks was not, as we have ruled, the proximate cause of the defendant's paying them wrongfully. Simms did not know of the fraud, he said, so a mere examination of the checks, indorsements and stubs would have disclosed nothing. At least there is nothing in the record to show the forged indorsements could reasonably have been detected by inspection; and the plaintiff was under no duty to compare the checks with its office records. On this point the following is said in Detroit Piston Ring Co. v. Wayne Co. & H. S. Bank, 252 Mich. 163, 233 N. W. 185, 75 A. L. R. 1. c. 1282:

"It was also argued that plaintiff was negligent in failing to compare the returned checks with the employment cards or the time cards. This would have disclosed the forgeries, but we do not believe the depositor has a duty to compare his returned checks with any of the records of his office except his check book or register."

There is another point in connection with this defense. Section 2819, Revised Statutes 1929, provides in substance that no bank or trust company shall be liable to a depositor for paying and charging a forged or raised check to his account unless the depositor shall notify the bank that the check was forged or raised, (1) within one year after advice from the bank that its vouchers for the period during which such payment was made are ready for delivery, (2) or if no such notice is given by the bank, then within one year after the return to the depositor of the voucher covering such payment.

The Springfield Court of Appeals in two recent cases has treated this statute as applicable to checks cashed on forged indorsements, where the depositor does not actually become advised of the forgery before the one year period of limitation has run. [Royal Indemnity Co. v. Poplar Bluff Trust Co., 223 Mo. App. 908, 915, 20 S. W. (2d) 971, 974; Ward v. First Natl. Bank, 224 Mo. App. 472, 480, 27 S. W. (2d) 1066, 1070.] But the great weight of authority elsewhere holds the same or similar statutes cover only forged or raised checks, not the indorsements thereon. [Kleinman v. Chase Natl. Bank, 207 N. Y. Supp. 191, 124 Misc. 173; McCornack v. Cent. State Bank, 203 Iowa, 1. c. 845, 211 N. W. 542, 52 A. L. R. 1297; Detroit Piston Ring Co. v. Wayne Co. & H. S. Bank, 252 Mich. 163, 233 N. W. 185, 75 A. L. R. 1. c. 1278; 25 Columbia Law Review, p. 666; 38 Harvard Law Review, p. 679.] In view of the doubtful application of the

statute, we shall not say it is directly available as a defense here. But this thought is suggested: if the law allows a depositor one year in which to discover a forgery appearing on the face of his check, or purported check, certainly the short period of three months elapsed in this case is not too liberal an allowance for the discovery of forged indorsements, which are more difficult to detect.

We are therefore of the opinion that on this third defense made by the trust company no substantial showing was made.

From this, in connection with the rulings made on the other points presented, it follows that the conclusion reached by the Kansas City Court of Appeals is correct, and that the judgment of the trial court should be and is reversed and the cause remanded with directions to enter judgment for plaintiff for $2226.30, with simple interest at the rate of six per cent per annum from January 1, 1923, the date of demand. *Atwood* and *Frank, JJ.*, and *Gantt, C. J.*, concur; *Ragland, J.*, dissents; *White, J.*, dissents in separate opinion; *Henwood, J.*, dissents and concurs in separate opinion of *White, J.*,

WHITE, J. (dissenting)—I cannot concur with any conclusion reached in the principal opinion. The statement of facts therein is correct so far as it states the facts, but certain conclusions from them are not warranted, I think, by any facts stated.

I. The opinion is based upon an unusual position. The plaintiff's case almost entirely was made out by oral testimony to which defendant in answer interposed a general denial. Yet, the opinion by directing a verdict refuses to allow the trial court to pass upon the credibility of that testimony. True, some of those facts are admitted in the briefs of respondent, but many facts necessary to make out a case are not admitted. Besides, inferences drawn by the opinion from the evidence are absolutely necessary to prove the plaintiff's case.

In considering a demurrer to the evidence every inference from the evidence favorable to the plaintiff may be indulged. The reverse is true in a directed verdict for plaintiff. Every inference that may be drawn from the evidence against the plaintiff must be indulged and notwithstanding the plaintiff's case must be conclusively proven. Every inference and every presumption is indulged in support of the judgment of the trial court. In the majority opinion every inference and every presumption is indulged *against* the judgment of the trial court. The opinion assumes that all evidence favorable to plaintiff is true, and all evidence tending to show a defense is presumed to be false.

II. Consider the issues. The plaintiff in its petition bases its case, as stated in its reply brief, solely on the allegation that the defendant did not pay the money called for by the checks "to any

person or persons having a right or authority to receive the same.'' It is not alleged that the *defendant* was negligent in any manner in failing to discover the alleged forgery. Plaintiff in a belated reply, apparently after the evidence was in, attempted to bring that issue into the case by reply, which it could not do. It could not recover on a cause of action stated in a reply as we have repeatedly held. The appellant, aware of failing to plead it, in its reply brief says: ''The case is not based upon defendant's negligence.'' For that matter there was no evidence of any such negligence. Yet the opinion assumes that a ''conclusion'' of such negligence is warranted. In seeking to show that Tschupp impersonated five different persons at the same bank every week for nearly two months, thus giving defendant an opportunity to identify him, the opinion, conceding there was no direct evidence of such impersonation, calls attention to an admission in defendant's brief that the defendant cashed certain checks at the defendant bank. That statement in the brief refers to the pages of the record where Tschupp says that he cashed or *caused* to be cashed the checks under consideration and did not *say where they were cashed*. Nor did he at any time in his deposition say that he cashed any one of them at the defendant bank. The statement in the brief that he cashed some of them at the defendant bank is clearly an inadvertence in reading his testimony for the pages where that testimony occurs are cited. Yet the opinion takes that statement in the brief, calls attention to the fact that this was a large bank with several different departments and reaches this conclusion:

''But in view of the admission in defendant's brief and such evidence as does appear in the record we think the foregoing conclusion is warranted.''

Thus it is declared that an indefinite admission in a brief, combined with circumstantial evidence, entirely oral, warrants a ''conclusion'' of fact which authorizes a directed verdict.

■ The plaintiff in order to prove its case introduced evidence to show the function of Mr. Simms, said to be secretary and treasurer of plaintiff. Every fact in relation to his official status, his authority and his *intention*, had to be proved by oral testimony. Every such fact was denied in the answer and the denial supported by strenuous arguments throughout defendant's briefs. Yet the opinion by *directing a verdict* assumes it was *all true* and all conclusions from it must be resolved in favor of plaintiff.

The preposterous statement of Simms that he *intended* the payee in each check to receive the money called for, *is presumed to be true* and the trial court is not allowed to pass upon it, although the first checks signed by Simms were payable to Dabney, and Simms knew Dabney was *not* entitled to the money.

■ III. The opinion holds that a demurrer to the evidence was

sustained and in that particular the trial court erred and we have that alleged error for consideration. The record recites that such a demurrer was filed and the opinion copies the motion, which is called a demurrer, but the record proper and the judgment entered showed that no such demurrer was sustained, nor considered by the court at all, because the judgment recites:

"Now on this day this cause having been heretofore submitted to the court upon the pleadings, evidence and proof adduced, and by the court taken under advisement, and the court being now fully advised in the premises finds the issues in favor of the defendant."

None of the arguments in the briefs filed in the Court of Appeals or in this court considered any such alleged ruling as the sustaining of a demurrer to the evidence. The plaintiff in its motion for new trial and its motion in arrest failed to assign error to such ruling or to mention it. The opinion, however, calls attention to the admission by defendant in its brief that such a demurrer was sustained and concludes that defendant is thereby estopped to deny that such ruling was *preserved as an error in the motion for new trial*, although the plaintiff does not claim any such error was preserved in any part of its briefs. Where a peremptory instruction or declaration of law is given, the effect is to withdraw all other instructions or declarations. [Crossett v. Ferrill, 209 Mo. 704, 108 S. W. 52.] Yet the plaintiff in its motion for new trial assigns error to the refusal of every one of its instructions, some of them based on the findings of fact of the court sitting as a jury. It shows that the plaintiff did not consider that the sustaining of a demurrer was an issue in the case. On the contrary it assigned error to the alleged erroneous finding of facts of the court sitting as a jury. This point, however, is unimportant in considering the opinion for it directs a verdict for plaintiff.

It should be remembered that this is a demurrer, if there was one, to the evidence filed before the court *sitting as a jury*. A different situation occurs from that where such a demurrer is filed in a jury case. A demurrer to the evidence in a jury trial brings up only the question whether a submissible case is made out, with all the evidence favorable to plaintiff admitted to be true and all favorable inferences therefrom in favor of the plaintiff.

Such a demurrer is often not so treated when filed before the court sitting as a jury. It was not so treated in this case. It has been ruled that in a case tried before the judge sitting as a jury where such a demurrer or motion for nonsuit is filed, the court must decide it according to the preponderance of the evidence. [38 Cyc. p. 1560; Hayward v. Jackman, 96 Iowa, 77; Griffith v. Arnold, 216 N. W. 728.]

This court has held that although such a demurrer before the court sitting as a jury is sustained, if the parties treat the case as submitted for a finding of facts on the evidence, this court will so treat it. [Anthony v. Building Co., 188 Mo. 1. c. 718, 719, 87 S. W. 921.]

126

It is evident from the complete argument in the briefs filed in this court, from the declarations asked by plaintiff and from plaintiff's assignments of error in its motion for new trial, that both parties understood that the alleged demurrer to the evidence, if noticed at all, meant only that plaintiff did not satisfactorily prove its case.

It seems to be assumed by the leading opinion, that because defendant argues the points made by plaintiff on the latter's theory of the facts, the defendant thereby admits plaintiff's interpretation of the evidence. Yet defendants all the time repudiated such interpretations.

█ IV. Now consider the defenses. One defense was the negligence of plaintiff. The answer alleged that the first day of each month the defendant furnished plaintiff monthly statement of account accompanied by canceled checks and voucher, and that that statement bore in bold type:

"Please examine this statement at once and report any error. If no error is reported in ten days the account will be considered correct. The items are credited subject to final payment."

The plaintiff joined issue on that allegation in its reply, denied that it failed to exercise reasonable care in examination of the checks and statements, and alleged affirmatively that it *did examine monthly* the checks and statements, "to determine if there were any errors *or forgeries* in respect to said account, and in doing so exercised reasonable care and diligence." Having thus joined issue on that alleged negligence the plaintiff is hardly in position to claim it is not in the case. Yet the evidence of defendant's negligence is ignored by the opinion or assumed to be false, although proven by plaintiff's witnesses.

The point is made that the maker of a check is not obliged to know the signature of the payee. That is a correct statement of the law. But the argument jumps from that and reaches the conclusion that an employer is under no obligation to know its own employees; and under no obligation to know the handwriting of its much trusted payroll clerk who made out the list of employees with all the names in his handwriting. That is particularly pertinent here.

Several of the twenty-two cashed first at other banks came to defendant bank *before any other checks* involved were cashed by the defendant bank, the first one thirty-five days before. Eleven of those twenty-two checks were made payable to D. W. Dabney, beginning with the first one September 15, 1922, and the last one December 1, 1922. Six of them were cashed at different dates from September 15th, to October 13, 1922. The first check other than those coming from other banks was cashed October 20, 1922, thirty-five days after the cashing of six of those Dabney checks. On the first day of October when the plaintiff's pass book was returned to it, it contained

three checks payable to Dabney: September 15, September 22, and September 29, and no other of the checks involved. At that time none of the other bogus checks had been issued. Those three checks coming through other banks in the usual course of business were returned to the plaintiff with the statement pleaded, that plaintiff examine and see if everything was correct. Plaintiff, not only as a general rule but under the particular circumstances of those checks, was negligent. Simms who, plaintiff says, was the authorized officer to execute checks, knew Dabney, said he was employed at the time. (Tschupp swore that Dabney was not then employed.) Yet Dabney "was paid in a different way than by payroll checks." He, when employed, "was engaged in out-of-town work." He was paid by checks prepared upon order of the manager of the fixture department, and which came to Simms from the cashier's office. Dabney's name had no business on the payroll list. All this Simms testified to. When asked if in signing the checks any question arose in his mind as to why payroll checks should be made to Dabney, knowing that he was paid in a different way, his answer was: "No, I signed them by the hundred."

This means that he signed them mechanically without reading the names of the payees. *If he had read Dabney's name in the checks he would not have signed them. If he had looked over the canceled checks returned October first he would have discovered the fraud.*

He makes the bold assertion that he was under no obligation to notice the name of any payee in checks he signed nor on the canceled checks returned with request by the bank that he examine them. The checks were made out by Mrs. Hubbard from the payroll list on the payroll book which was in Tschupp's handwriting; the name of the payee in every check was in Tschupp's handwriting on the payroll list. Mrs. Hubbard knew his handwriting. Mr. Griefe testified that on the return of the checks he didn't reconcile them; he turned them over to two girl assistants working there, for reconciliation. One of his assistants was Mrs. Hubbard, the other was Miss Atkinson. Mrs. Hubbard was a witness; Miss Atkinson was no longer employed and was not a witness. Thus the reply alleges that the returned checks were examined for forgeries. Mr. Griefe's testimony is that Mrs. Hubbard was to perform that duty. Mrs. Hubbard in her testimony fails to state that in examining the checks she looked at the endorsements. She knew Tschupp's handwriting. If she had looked at the endorsements she would have found them in Tschupp's handwriting. The slightest diligence in making that examination would have discovered the fraud or forgeries if in fact Tschupp did forge the names of the payees.

Mr. Griefe testified that he finally discovered the fraud when he learned from the head of the department in which the man Peden had worked that Peden was no longer employed. Tschupp testified

that when he received the signed checks in the first instance from Mr. Simms he delivered them, save the ones which were fraudulently issued, to the heads of the several departments. According to Mr. Griefe's testimony, an inquiry of the head of each department would have revealed the actual list of employees entitled to checks, yet no precaution as simple as that was taken.

It is the duty of a bank to pay out money on a depositor's check only to the holder thereof under a genuine endorsement; yet if the bank is deceived, misled or induced to make such payment by the negligent acts of the depositor it is a good defense to an action by the depositor against the bank for the money so paid out. [Erickson Co. v. Iowa National Bank, 211 Iowa, 495; Kaszab v. Greenebaum Sons Bank, 252 Ill. App. 107; Detroit Piston Ring Company v. Bank et al., 75 A. L. R. (Mich.) 1273.]

Each of those cases was a payroll case when a trusted agent caused checks to be issued payable to persons not entitled to the money, forged the endorsements of such persons and got the money. In each case the defense was negligence of the depositor in permitting checks to be put in circulation and failure to examine the canceled checks when returned with a statement similar to the one pleaded here, requesting the depositor to make such examination. In each case the negligence of the depositor was a question for the jury.

In the Illinois case the unrestrained opportunity of the bookkeeper to commit the forgeries and the failure to examine the monthly statements rendered depositor with all vouchers are mentioned as acts of negligence which barred recovery, citing numerous cases, including Morgan v. U. S. Mortgage Co., 208 N. Y. 218, and Empire Trust Co. v. Cahan, 274 U. S. 473.

In the Michigan case, 75 American Law Reports, 1280, the court mentioned the rule that a bank is not warranted in paying out money of its depositors except in strict accordance with his orders, and adds:

"The bank may justify such payment, however, by showing that the depositor was negligent in carrying out some duty which it owed the bank, in such a way as to be the cause of the improper payment." citing numerous cases, and:

"All the courts in this country are agreed that the depositor should carefully examine the bank statement, the check stubs and returned checks."

In Land Title & Trust Company v. Northwest National Bank, 196 Pa. St. 230, the court (l. c. 234) commented upon the principle, as follows:

"The reason of the rule that when a bank pays a depositor's check on a forged indorsement, or a raised check, it is held to have paid it out of its own funds and cannot charge the payment to the depositor's account, is that there is an implied agreement by the bank with its depositor that it will not disburse the money standing to his credit

except on his order. The rule applies where a check has just been lost or stolen and the payee's name has afterwards been forged; but it does not protect a depositor who is in fault, as in entrusting a check to one who he has reason to suppose will make a fraudulent use of it, or in so carelessly filling up a check that it may readily be altered, or in issuing a check to a fictitious person. It is confined to cases in which the depositor has done nothing to increase the risk of the bank. It should not apply when the check is issued to one whom the drawer intends to designate as the payee; first, because in such a case the risk is not the ordinary risk assumed by the bank in its implied contract with the depositor, but a largely increased risk as it follows that a check thus fraudulently obtained will be fraudulently used; the bank is deprived of the protection afforded by the fact that a bona fide holder of a check will exercise care to preserve it from loss or theft, which are the ordinary risks; there is thrown upon the bank the risk of antecedent fraud practiced upon the drawer of the check, of which it has neither knowledge nor means of knowledge;''

Section 2653, Revised Statutes 1929, provides:

''Every negotiable instrument is deemed *prima facie* to have been issued for a valuable consideration and every person whose signature appears thereon to have become a party thereto for value.''

Section 2688, Revised Statutes 1929, provides:

''The maker of a negotiable instrument, by making it, engages that he will pay it according to its tenor, and admits the existence of the payee and his then capacity to endorse.''

The plaintiff executed and put in circulation each of those checks. In doing so it indicated that the payee had the then capacity to endorse it and under Section 2653 each of those checks was deemed *prima facie* to be issued for a valuable consideration and every person whose signature appeared thereon to have become a party thereto for value.

The plaintiff in this case by the negligence alleged by defendant, denied by the plaintiff, and conclusively proved, permitted the fraud to be accomplished under its eyes, and justified the trial court in finding as a fact that such negligence was the proximate cause of the loss and in rendering judgment for defendant, regardless of a ruling on any other defense.

Tschupp was the only witness who knew exactly what he did in cashing the checks. He swore that he *put them in circulation*. If so, he could not have cashed them at defendant bank because that was to retire them from circulation. He swore that he *caused* some of them to be cashed. Then he must have had a confederate. Nowhere does he say where any one of them was cashed. Those that bore the stamp of no other bank may have been cashed at another bank or cashed at a store. There is no evidence to the contrary. He

said he wrote the names of the payees on the backs of the checks, in answer to direct questions asked by plaintiff's counsel. The trial court was not obliged to believe that statement for the plaintiff was making out its case. Indulging every presumption and every reasonable inference from the evidence in favor of the judgment it may be inferred that none of the checks were cashed in the first instance at the defendant bank; that Tschupp had authority, and sole authority, to determine who was entitled to be on the payroll, and therefore entitled to determine who should receive the checks. From the careful way in which the plaintiff's counsel avoided eliciting from Tschupp the manner in which he had accomplished the fraud, showed that it was afraid of the actual facts. From that evasion and the conduct of Simms the trial court might have believed that Tschupp's confederate was in some instances, if not all, the very payee named in the check, who, the petition falsely states, was entitled to the money.

Simms swore that it was his intention, and therefore the intention of plaintiff, that the payee named in each check should have the money called for. If he entertained the intention to which he swore, his duty was to exercise discretion in signing the checks. How can it be said that he exercised discretion when his brain did not function at all? His hands obeyed the will of Tschupp who furnished the list. It was as if Tschupp or Mrs. Hubbard had attached his rubber stamp. Names of payees meant nothing to him. His testimony shows that he did not attempt or care to know whose name appeared as payee; *that it was not his duty to know or care.* He surrendered his intention to the intention of Tschupp. Whatever Tschupp intended was O. K. with him, for he intended nothing. His testimony that he intended the payees named to receive the money was obviously framed to meet plaintiff's theories of the case.

■ The rule is that where one signs a paper without reading it, he is presumed to know its contents and is bound by its terms. [Anderson v. Drug Co., 149 Mo. App. l. c. 574, and cases cited: Crim v. Crim, 162 Mo. l. c. 552, 63 S. W. 489; Allgood v. Tarkio Elec. & Water Co., 222 Mo. App. l. c. 969; Dyrssen v. Electric L. & P. Co., 317 Mo. 225, 295 S. W. 116.]

Apply that principle here. Simms having signed the checks without reading them is presumed to know their contents and the purpose of issuing them. He is presumed, for instance, to know that Dabney was one payee, and he *did* know that Dabney was not entitled to the money. In all of them he submitted his action to the will of Tschupp. Tschupp's intention was his intention, for his discretion did not function. The act of issuing the bogus checks was the act of plaintiff. The intention to have the checks payable to fictitious persons was the intention of plaintiff from the presumed knowledge of Simms. Tschupp was the agent of plaintiff authorized to ascertain the per-

sons to whom money was due for Simms exercised no discretion in the matter.

And yet in spite of all the evidence of these circumstances the opinion holds that the plaintiff conclusively proved its case authorizing a directed verdict, and that there was no evidence to be even considered by the trial court in defense nor in support of the negligence alleged in defense.

I think the opinion is not supported by the authorities, therefore I dissent. *Henwood, J.,* concurs.