OREON E. SCOTT and RAYMOND G. SCOTT, Copartners Doing Business Under the Firm Name of OREON E. & R. G. SCOTT, Appellants, v. FIRST NATIONAL BANK IN ST. LOUIS, a Corporation.—119 S. W. (2d) 929.

Court en Banc, September 28, 1938.

78

*Jeffries, Simpson & Plummer* for appellants.

80

*Thompson, Mitchell, Thompson & Young* for respondent.

PER CURIAM:—The facts, stated in the Divisional opinion of COOLEY, C., in Division No. Two, are adopted (without use of quotation marks) as follows:

Suit at law, in forty counts, ranging in amount from $90 to $3091, aggregating $24,634.42. The suit was brought to recover money paid by the bank out of plaintiffs' account therein on checks issued by plaintiffs, upon which the endorsements of the named payees were forged, the checks, therefore, not being paid to the named payees or to their orders. There were forty such checks, each being described in a separate count of the petition. There was a verdict for defendant bank on each count, from which the plaintiffs appealed.

It was admitted by the pleadings and at the trial below that all of the checks in question were issued by plaintiffs, payable to the

order of named payees, and were paid by defendant bank out of plaintiffs' account therein and by the bank charged to plaintiffs' account, which was at all times sufficient to meet the checks; and that said checks were not paid to the named payees or to their orders, but were paid to another person upon what purported to be but was not the endorsement of the named payee. In other words what purported to be the endorsement of the named payee on the back of each check was a forgery. For convenience and brevity we may refer to said checks as the forged checks, keeping in mind that we do not mean thereby that the checks themselves were forged,—they were not—but only that the purported endorsements of the named payees on the backs thereof were forgeries. Having thus made a prima facie case plaintiffs rested.

Defendant then introduced evidence for the purpose of showing its pleaded defense, to the effect that the plaintiffs had been guilty of negligence in issuing the checks which constituted a breach of their duty to the bank and which proximately caused the forgeries and the consequent payment of the checks, and that plaintiffs are estopped to claim reimbursement. No point is made as to the sufficiency of the pleadings, which are quite lengthy. Since there is a sharply contested question as to whether or not the court should have directed a verdict for plaintiffs a somewhat extended statement of the facts is necessary.

Plaintiffs were engaged in the real estate business in St. Louis, doing a large business. Among other activities they managed, for the owners, numerous apartment properties, collecting rents, seeing to repairs, upkeep, operation, etc. They issued many checks each month. Defendant's only witness on this point, L. J. Meyer, did not know the approximate number or the aggregate amount thereof but his testimony shows that plaintiffs did a very extensive business and issued at least five hundred checks a month. One of the partners testified that they issued on an average about eight hundred checks a month and did a total business aggregating about $500,000 a month. Necessarily they kept a somewhat elaborate set of books. There is no evidence on behalf of defendants tending to show that plaintiffs' system of bookkeeping was improper or inadequate. On plaintiffs' side it was shown that such system had been recommended and approved by a firm of competent and accredited accountants.

Defendant's case rests chiefly upon the testimony of the forger, L. J. Meyer, whom it called as its principal witness. His testimony tended to show the following:

Meyer had worked for plaintiffs from about 1920 to about August, 1925, as bookkeeper and assistant cashier, in which latter capacity he was entrusted with the handling of money. About August, 1923, it was discovered that he had embezzled about $12,500 of the firm's money, and he was discharged. A week or so later the firm re-em-

ployed him as bookkeeper, upon the earnest solicitation of himself, his wife and friends and upon his promise to work faithfully and to lead an exemplary life and to endeavor to pay back his defalcation, especially to the bonding company. He had been bonded by a surety company in the sum of $3000, which it appears the surety company had been compelled to pay on account of the embezzlement. When Meyer was re-employed it was agreed that he should receive a regular salary of $175 per month, which we understand was an increase over his previous salary, and that $50 per month thereof was to be retained by plaintiffs and paid to the bonding company upon the said $3000 which it had been compelled to pay, leaving net to Meyer out of his salary $125 per month. Plaintiffs, however, agreed to try to find extra work for Meyer, if possible, so as to enable him to support himself and family and keep up his payments to the bonding company and did give him some extra work, from which he received about $6 a week, and he also received a Christmas "bonus," from all of which sources it appears from Meyer's testimony that he was receiving from plaintiffs approximately $200 per month, less the $50 a month paid to the bonding company. (From plaintiffs' evidence in rebuttal it appears that, with the extra work and bonuses, he received a total of about $225 a month, less said $50 a month deduction.)

When Meyer was re-employed he was employed as bookkeeper only, being relieved of his former duties as assistant cashier and of all duty or authority to handle money. He kept what was known as the landlord ledger, in which were entered various charges, such as for repairs, etc., and credits, that plaintiffs had against landlords in connection with apartment houses that plaintiffs were managing. Bills would be presented to a Mr. Doty, a trusted employee of plaintiffs, who would examine and "O. K." them, whereupon Meyer would prepare checks, ready for signature, and hand them, with the O. K.'d bills attached, to one of the Scotts for signature. Generally, at the times here involved, such checks were handed to and signed by Raymond Scott. Only he or Oreon Scott, the other partner, was authorized to sign checks. The checks, when signed, were supposed to be taken back to Mr. Doty, whose duty, it seems, was to disburse them, but, sometimes at least, perhaps often, if the payee was present and waiting at the counter Meyer would hand him his check, though this does not seem to have been part of Meyer's duty. Whether or not such practice was known to the Scotts does not clearly appear, though it may be inferred from Meyer's testimony that they knew or should have known that it sometimes occurred. In this connection it appears that checks were handed to Raymond Scott in bunches, with O. K.'d bills attached, except that Meyer said there would be no bill attached to a check on which he meant to forge the endorsement. Scott would sign the checks without inquiry or investigation, assum-

ing that they were for bills owed by the firm and that proper verification had been made by the employee, Doty, whose duty it was to make same.

After his re-employment Meyer conducted himself honestly for about three years, that is till the latter part of August, 1928. In the spring of 1928 he had opportunity to buy a roadhouse business then known as Lone Cedar Inn. He testified that he told Raymond Scott about this and that he was having difficulty supporting his family and keeping up his payments to the bonding company, was going backward instead of forward; that if, as he expected, he could make some money out of the Inn he would apply his share of the profits from that business on what he owed the Scotts; and that Raymond Scott said he did not care how he got the money, just so he brought it in. He and one Laurentzen bought the business and equipment of the Inn with a two year lease at $50 per month, the lease carrying an option to purchase the property at the end of the first year for $12,-000 and at the end of the second year for $13,000. The price paid was $1250. Laurentzen paid $500 cash and Meyer agreed to (and it seems to be assumed did) pay $500 in ninety days. The balance was to be paid out of profits. The name of the place was changed to Gingham Inn. A month or so later Meyer bought out Laurentzen's interest and thereafter operated the place, either alone (through agents) or in partnership with his aunt, a Mrs. Hagendorn.

Meyer operated Gingham Inn at nights (he was a musician), working for the Scotts during the day. It became, or at least was by Meyer thought, necessary to make extensive improvements at the Inn, which cost in all some twenty odd thousand dollars. (Dining room capacity was increased from about 90 to more than 300, and a stage and floor show provided.) Meyer said that he discussed his plans for these improvements with Raymond Scott; that the latter was a rather frequent, though intermittent, visitor at the Inn, coming sometimes two or three times a week, sometimes not being there for a month. From Meyer's testimony, if true, it is apparent or at least inferable that plaintiffs knew the improvements were being made and were expensive, also that they must have known that Meyer did not, personally, have means with which to pay for them other than his salary and the prospective profits of the business. It does not appear that Meyer ever discussed with either of the Scotts how he was financing his improvements or that he asked them for financial assistance in that enterprise, or that they inquired of him concerning those matters. It seems from plaintiffs' evidence in rebuttal that they thought, or assumed, that Mrs. Hagendorn, Meyer's aunt, was a partner in the Gingham Inn business and was, perhaps, putting up the necessary money. At any rate they seem to have made no inquiry about it.

The first forged check was dated August 31, 1928. Four of the

first eight forged checks were used to pay a contractor doing work at Gingham Inn. In January, 1929, Meyer opened an account in the Mercantile Trust Company, of St. Louis, in the name of Gingham Inn. Thereafter, he would deposit the forged checks in that account, after having forged the payee's endorsement, also endorsing them "Gingham Inn, L. J. Meyer." He would then check on that account for his personal use, in most cases for expenses on account of the Inn. All of said forged checks were presented for payment either to said Mercantile Trust Company or some bank other than defendant, were cashed and passed through the St. Louis Clearing House, maintained by the banks of the city, and thus reached defendant bank. When they thus reached the defendant bank all bore the stamped endorsement of each bank through which it had passed and of the clearing house and each such endorsement guaranteed all prior endorsements.

Said forged checks did not represent indebtedness actually owed by plaintiffs to the named payees, though Scott, in signing them, supposed they did and intended them for the persons respectively named as payees, all of whom were doing work for plaintiffs either as ash haulers, or painters and paper hangers on the various buildings they managed. Many of the checks were for sums considerably larger, according to Meyer's testimony, than the named payee usually received at one time, notably one to a Mr. Cullen, an ash hauler, for $3091 (the largest), and more than half of them were to A. T. Duvall, a painter, for over $700 each. Meyer said that genuine checks to Duvall would not usually be for more than $275. About once a month the bank would balance plaintiffs' pass book and return to them the checks then paid, which, of course, included from time to time the said forged checks. Plaintiff's bookkeepers, usually the head bookkeeper, Hortleder, assisted by Meyer, would "reconcile" the bank's statement and the returned checks with plaintiffs' general ledger.

Plaintiffs did not keep check stubs, but they had a book, frequently referred to as the "check register," also called,—and labeled—the Cash Disbursement book. For convenience and brevity we shall call it the check register. This book had ruled columns for date, amount, name of payee, etc., of checks such as those here involved, issued by plaintiffs. Meyer testified that all of the checks in question were duly entered by him in that book. There was another book, called the journal, in which checks for certain purposes, not here involved, were entered. From the check register and the journal all checks were posted to and shown in what was called the general ledger, which was kept by the head bookkeeper, Hortleder. Meyer had nothing to do with the keeping of that book. For making up the general ledger Hortleder got his data from the check register and the journal. The general ledger would contain "what are called the control accounts,

that is, in the general ledger there is an effort made to distribute the items of receipt and expenses among as few as possible general headings.'' The landlord register, kept by Meyer, was a ''subsidiary record'' and was not one of the ''control accounts.'' Hortleder did not examine that book in getting data for making up the general ledger. In the general ledger there was shown an account with defendant bank which showed all checks issued by plaintiffs, posted, as above stated, from the check register and the journal.

In ''reconciling'' the bank's monthly statement with plaintiffs' books Hortleder, with the assistance of another bookkeeper, frequently Meyer, would compare or check up the returned checks with the entries shown in the general ledger, ''so that in reconciling the bank's statement, if they would take the account as it appeared on the general ledger they would find an entry covering each one of the checks'' (here involved) and there would be no apparent irregularity. If it was desired to find support for the general ledger entries ''the check register could be taken where the witness had entered said checks showing the name of the payee and the amount of the check, and that those entries would correspond exactly with the bank's statement as to the amount of the checks, and that the general ledger and the check register would show the amount of the forty checks exactly as shown by the bank.'' The ''subsidiary'' landlord register, kept by Meyer, which had to do only with certain limited accounts of plaintiffs with persons whose properties they were managing, as between plaintiffs and such persons, was not consulted in making the ''reconcilement.'' In making these monthly ''reconcilements'' Hortleder did not examine or observe the endorsements on the backs of checks. In this connection it should be stated further that neither of the plaintiffs nor anyone for them examined or observed the endorsements when checks were returned by the bank. Hortleder testified that if he had seen Meyer's endorsement on the back of any of the checks he would have made an investigation and ''probably reported it to Mr. Scott.''

As a result of Meyer's failure to note the forged checks in the landlord ledger, kept by him, and the fact that they were entered in the check register and the general ledger, the landlord ledger was not in balance with said other books after the forgeries began, which fact would have been disclosed had a ''trial balance'' of the landlord ledger been taken and compared with a trial balance of said other books. Such trial balance of the landlord ledger could have been taken in a very short time. Meyer did not say and there was no evidence on behalf of defendant tending to show whether or not it was customary in plaintiffs' office, or required by rules of good bookkeeping, to take, from time to time, such trial balance from a ''subsidiary record,'' such as the landlord ledger, and compare it with a trial balance of the other books in the office. Hortleder, for

plaintiffs, testified such trial balance of the landlord ledger "was usually run every eighteen months to two years, and it was about time for it again" when the forgeries were discovered. Such trial balance had not been "run" during the time covered by the forgeries.

In the early part of 1929 plaintiffs had an office audit or inventory made for income tax purposes, which was completed in March of that year. It disclosed an apparent shortage in total assets of some ten to fifteen thousand dollars. No investigation was made at that time. Defendant's evidence does not show how such audit was made nor whether it would involve or reasonably lead to examination or checking up of the landlord ledger. According to plaintiffs' evidence it would not, and in making it no trial balance was taken of the various books. Oreon Scott, who, with a bookkeeper, Miss Hortleder, made this so called audit, or inventory of assets and liabilities, testified that the books could have been seriously out of balance without the fact showing in such inventory, and explained how that could have occurred. Among other reasons he said properties were carried on the books at their actual cost but in making this "inventory" were listed at what was considered their actual values, which did not appear on the books, and the apparent shortage might have come about in that way, or it might have been a clerical error in copying the figures. He said he did not investigate the source of the discrepancy at the time because it did not amount to anything vital; that he did not think of anyone in the office stealing and supposed it was an error of some kind, because the same thing happened from year to year,—"they often had some discrepancy and it didn't amount to anything ultimately." He also testified, however, that while he did not have a trial balance of the various books run in making said audit or inventory he asked the bookkeepers if the books were in balance and was told they were. In this connection Meyer testified that during the course of that audit Scott "wanted a trial balance of last year rent ledger (landlord ledger?) as of December 31, 1928;" that said book was not in balance with the other books but he, Meyer, "Handed Mr. Scott a figure that ordinarily would have been in balance with the check register and the general ledger, and Scott took his word for it."

Mr. Wm. C. Tompkins, auditor of defendant bank, was called as a witness by defendant. From his testimony it appears that defendant was a large institution, doing an extensive banking business, handling on an average of eighteen to twenty thousand checks daily "through the clearance." He said it would be a physical impossibility for the bank to verify the genuineness of endorsements on checks so received, and explained why. Such checks were handled by bookkeepers. If the bookkeeper "discovered any suspicious circumstances or anything that indicated the check had not been properly en-

dorsed by the payee, and that it was not authentic on its face and back, that check would be returned to the bank they got it from.'' Otherwise it would be paid. No investigation or inquiry was made as to the genuineness of the payee's endorsement. Using a check payable to the order of S. W. North as an illustration he said that defendant bank made no investigation as to whether North endorsed it but ''relied on the endorsement of the National Bank of Commerce as they rely on the endorsements of other banks, that the endorsements on items received by them are genuine;'' that before defendant would pay a check so received it must have the stamp or endorsement of the bank or banks through which it had passed ''and the reason that these checks were paid is because they did bear those stamps.'' Tompkins further stated that the bank ''relies on its depositors exercising reasonable care in the issuance of checks,'' and added in that connection ''that practices of the . . . bank with reference to relying upon the apparent authenticity of checks that clear on it and are presented for payment is the general banking practice among the banks in St. Louis.'' It is inferable from Tompkins' testimony as a whole that in paying checks reaching it, as did those here in question defendant assumed that the named payees' purported endorsements were genuine and, as to the genuineness of the payee's endorsement, at least partly relied upon the endorsement of the bank that had originally cashed the check or upon that and subsequent similar endorsements guaranteeing all prior endorsements.

Plaintiffs contend that defendant's evidence was insufficient to make a jury case on its affirmative defense, of negligence and estoppel and that their demurrer to the evidence should have been sustained as to all counts. However, the situation is not the same as to all counts. The first four checks were obtained and cashed in 1928. They were made out and dated and used as follows:

August 31, 1928, to S. W. North for $92.80. Meyer forged the payee's endorsement, *endorsed his own name* thereon and gave the check to the orchestra leader at the Gingham Inn to pay his orchestra.

November 12, 1928, to S. W. North for $481.50 and November 23, 1928, to J. Duvall for $487.50. Meyer forged the payee's endorsement for both but did not endorse either. He gave them both to W. Busch, a contractor as payments on his construction work at the Inn.

December 21, 1928, to A. T. Duvall for $410. Meyer forged the payee's endorsement, *endorsed his own name* thereon and gave the check to a jewelry firm to pay his account.

In January, 1929, Meyer obtained and used four more checks; two of these payable to A. T. Duvall ($489.50, January 10, and $492.50, January 24) were used to pay Busch for his work at the Inn. He forged the payee's endorsement on both but did not endorse either. Thereafter, however, every check which Meyer obtained and used

was *endorsed "Gingham Inn"* and *L. F. Meyer.* There were two checks so endorsed in January ($90 and $166.40) ; the smallest of these was deposited in the Gingham Inn account in the Mercantile Trust Company while the largest was used to pay a lumber company's bill. All of the rest of the 1929 checks were deposited in an account opened by Meyer in January, 1929, in the name of the "Gingham Inn" in the Mercantile Trust Company and were collected from defendant through the St. Louis Clearing House, except one check for $733.98, dated May 3, 1929, which was given by Meyer to Busch. In addition to the two checks endorsed in January with the name of Meyer and the Gingham Inn, there were in February four checks ($436, $331.50, $332, and $361.50), and in March three ($387.50, $367.50 and $117.50), all of which were so endorsed. These were made payable to either S. W. North and A. T. Duvall. In April, there were four such checks ranging from $219.50 and $419.50. After that no check was for less than seven hundred dollars nor more than eight hundred dollars, except one for $1131.35 and one for $3092. All of twenty-five checks issued after March were made to A. T. Duvall except two to S. W. North and one, the $3092 check to M. Cullen. Duvall did papering and painting for plaintiffs in apartments they managed and his bills, presented usually about the first and fifteenth of each month, were from about $250 to $275. North was an ash hauler. He usually came in about the 10th of each month with bills containing items of $1.50 to $3 that "would not run higher than $200 in one month." Cullen was also an ash hauler, who did not work as regularly as North. Meyer attempted to erase some of the "Gingham Inn" endorsements after the cancelled checks were returned to plaintiffs' files but all of them remained apparent.

### I. *Counts 1 to 15 Inclusive.*

We will first consider the first 15 counts covering the four 1928 checks, the four January, 1929 checks, the four February, 1929 checks, and the three March, 1929 checks. This court (En Banc) reviewed the authorities, stated the prevailing rule, and established the principles to be followed on the question herein involved, in American Sash & Door Co. v. Commerce Trust Co., 332 Mo. 98, 110, 56 S. W. (2d) 1034, as follows:

"By the overwhelming weight of authority the negligence of a depositor which will relieve the drawee bank from cashing on a forged indorsement his check delivered to one person but made payable to the order of another, must be such as relates to the forgery or its detection and the payment of the check, not to the mere mistaken issuance thereof. The relation between the bank and the depositor is that of debtor and creditor. The bank's duty to make charges against the depositor's account only on his authentic order and genuine indorsements is absolute—contractual. It is not simply a question of using due care and of offsetting negligence against contribu-

tory negligence. To be available as a defense the negligence of the depositor must be of such nature as to interfere with the bank's performance of its contract, and in effect amount to a representation operating as an estoppel.''

In the American Sash & Door Company case, supra, one Tschupp, a trusted clerk of the plaintiff, procured the issuance of about fifty checks, over a period of some three months, payable to named payees, forged the payees' endorsements, and obtained the money thereon. The checks were all small, ranging in amount from about $35 to about $54, aggregating a little over $2200,—a sum hardly sufficient in view of the plaintiffs' extensive business to at once attract attention to mounting production costs. [See Detroit Piston Ring Co. v. Wayne County & Home Sav. Bank, 252 Mich. 163, 233 N. W. 185, 75 A. L. R. 1273.] We held that the issuance of the checks was not the proximate cause of the payment thereof on forged endorsements. But in summing up our discussion of the question of negligence we said, 332 Mo. 1. c. 113, 56 S. W. (2d) (7, 8) 1040:

''Tschupp's peculations covered only a comparatively short period of three months; there is no evidence that the plaintiff had any reason to doubt his honesty, before the event; the system in force in the plaintiff's plant required its payroll operations to pass through the hands of at least four people before payment was made; and the increased expense due to the fraudulent checks was evidently only a small proportion of the total payroll outlay.''

We think that the situation as to the 1928 checks and the January, February and March, 1929 checks in this case, is substantially similar to that in the American Sash & Door Company case. The first four checks were cashed over a period of four months. Only in November were there two checks in a single month. These were made to two different parties. Only the first and the fourth had Meyer's name endorsed on them, and the first was hardly large enough to arouse suspicion under the circumstances of plaintiff's usual dealings with the payee. Only the last two of the four January checks had ''Gingham Inn'' and Meyer's name endorsed. Four of the first eight checks came through Busch; each of the other four came through different subsequent endorsers; and only one of these came through the Mercantile Trust Company. The next seven checks (February and March, 1929) all came through the Trust Company and all of these had the name of Meyer and the Gingham Inn endorsed on them. It is true that in the Sash & Door Company case, the plaintiff had no reason to doubt the honesty of the defrauding employee before the event, while here Meyer had previously stolen a large amount of cash from them. However, when given another chance (no doubt upon apparently reasonable grounds which should not be discouraged by adoption of too harsh rules) he had conducted himself honestly for three years; and he had never at any time pre-

viously made out checks for bogus claims or been guilty of forgery. It is also true that there is evidence to show that plaintiffs failed to follow the requirements of their own office system, which they had established as a safeguard against issuing or delivering checks for incorrect amounts or for bogus claims, when checks were signed without bills attached showing the "O. K." of Mr. Doty thereon, and without being returned to him for disbursement. Nevertheless, if plaintiffs were negligent in being deceived by Meyer, by trusting too much to his reform or by signing checks, without seeing or examining bills for which they were issued, this would only be negligence in bringing the checks into existence. Negligence in the issuance of the checks is not negligence which will excuse a bank for paying them on forged endorsements under the rule established by the Sash & Door Company case. It clearly holds (and we think in so holding it follows the weight of authority) that only negligence "such as relates to the forgery or its detection and the payment of the check" will have that result; and it says that such negligent conduct of the drawer must "in effect amount to a representation operating as an estoppel" before it will relieve the bank. [For authorities generally see 99 A. L. R. 439 note; 9 C. J. S. 734-751; 7 Am. Jur. 426-430, secs. 589-593; 5 Michie, Banks and Banking, 527-553, secs. 279-281.]

Some cases apparently seek to make a distinction, as to liability for loss due to a forged endorsement, between a check properly executed for an actual *bona fide* purpose, which by negligence of the drawer thereafter got into the wrong hands, and a check improperly executed for a bogus claim which by negligence of the drawer was brought into existence without any actual valid purpose. [See C. E. Erickson Co. v. Iowa National Bank (Iowa), 230 N. W. 342; Defiance Lumber Co. v. Bank of California (Wash.), 41 Pac. (2d) 135, 99 A. L. R. 426; see, also, note 99 A. L. R. 439.] The latter situation is said to amount to a false representation to the bank on which it is drawn (although made by mistake) that it was executed for a valid debt actually due from the drawer to the person to whom it was drawn. It is argued that the drawer ought not to be allowed to put upon the bank the loss caused in part by his false representation of the original validity of his instrument even though he made such a representation by mistake of fact, because its execution increases the risk of the bank since he has by his negligence caused a check to be placed in circulation, intended to be fraudulently used (by the person who procured its execution) and unusually susceptible of being so used. This is put upon such grounds as the equity rule that "where one of two innocent parties must suffer, the loss must fall on him upon whom rests the greater responsibility for the circumstances which occasioned the wrong;" or the rule of concurring proximate causes by saying that the loss is caused

92

by both the drawer's negligent false representation to the bank that the check is valid *and* the forged endorsement. However, these grounds are not applicable to such a situation because there is no representation by the drawer by negligence or otherwise concerning the endorsement. Moreover, we do not think that such arguments can be logically applied to give a subsequent transferee rights in a negotiable instrument (at least under the Uniform Negotiable Instruments Act) because a subsequent transferee thereof to have any rights therein must be able to prove his own title. Therefore, regardless of negligence in bringing a negotiable instrument into existence, no subsequent transferee thereof can get any right under it, free from the maker's defense of his lack of title (unless it is payable to bearer), except through the payee's valid endorsement. [See Prudential Life Ins. Co. v. National Bank of Commerce (N. Y.), 125 N. E. 824, 15 A. L. R. 146; American Surety Co. v. Empire Trust Co. (N. Y.), 186 N. E. 436; First National Bank v. Produce Exchange Bank, 338 Mo. 91, 89 S. W. (2d) 33.] We, therefore, believe that the rule of the American Sash & Door Company case not only is the logical result of the relation of depositor and banker, but we also find it to be in accord with the rule established by the Uniform Negotiable Instrument Act, because a basic reason for the rule, that the drawee bank cannot charge against its depositor's account a check upon which the payee's endorsement has been forged, "is that the forged endorsement gives the bank no title to the check." [Brady on Bank Checks 182, sec. 135.] ▪ The Uniform Negotiable Instruments Act has been adopted in this State, and Section 2652, Revised Statutes 1929 provides: "Where a signature is forged, . . . it is wholly inoperative, and no right to retain the instrument, or to give a discharge therefor, or to enforce payment thereof against any party thereto, can be acquired through or under such signature, unless the party against whom it is sought to enforce such right *is precluded from setting up the forgery.*" Clearly under this statute, a bank, taking a check under a forged endorsement of the payee, obtains no rights against the drawer. Even so, however, the statute provides that a party to the instrument may be precluded from setting up the bank's lack of title thereto. The construction generally given to the word "precluded" in this statute is that it is used as synonymous with the word "estopped." [Baskett v. Ohio Valley B. & T. Co. (Ky.), 281 S. W. 1022; Embry v. Long (Ky.), 75 S. W. (2d) 1036; Day & Night Nat. Bank v. Polley, 77 S. W. (2d) 351; Home Credit Co. v. Fouch (Md.), 142 Atl. 515; International Finance Co. v. Peoples' Bank, 27 Fed. (2d) 523; Olsgard v. Lemke (N. D.), 156 N. W. 102; Negim v. First State Bank (Okla.), 49 Pac. (2d) 763; Brannans Negotiable Instruments Law 336.] Thus, neither under the authorities followed in the American Sash & Door case nor under our Negotiable Instruments statute,

can a bank justify charging a check against its depositor's account when the payee's endorsement has been forged, unless it can show facts sufficient to operate as an estoppel against the drawer to deny its title thereto. We hold that defendant's evidence was not sufficient to show either that plaintiffs had knowledge of the fraudulent conduct of Meyer or circumstances from which it can be held that they should have had knowledge thereof prior to March, 1929; and it was, therefore, insufficient to constitute a defense to the first 15 counts.

## II. *Counts 16 to 40 Inclusive.*

What conduct will preclude the drawer of a check (amount to an estoppel against him) to deny the title of the bank to it (and its right to charge it against his account) when the payee's endorsement is forged? It is well settled that there may be estoppel in situations where "a party has led another into the belief of a certain state of facts by conduct of culpable negligence, calculated to have that result" and which "has been the proximate case of leading, and has led, the other to act by mistake, upon such belief to his prejudice." [21 C. J. 1169, sec. 175; 10 R. C. L. 695, sec. 24; as applied to negotiable instruments. See Am. Jur. 319, sec. 606.] In the American Sash & Door Co. case, 332 Mo. 98, 121, 56 S. W. (2d) l. c. 1044, we said:

"We will not say the maker never is required to look at the indorsements. If, as in the Erickson case, supra, 211 Iowa, 495, 230 N. W. 342, the fifty checks had been further indorsed by Tschupp personally, showing all the money was going to or through him; if, as in the Detroit Piston Ring Co. case, supra, 252 Mich. 163, 233 N. W. 185, 75 A. L. R. 1273, the expense of the company had so unduly increased as to attract attention; if the plaintiff had known of part of the forgeries and failed to caution the trust company, if the forged indorsements had even been crude and obviously all in the same handwriting—in any of these circumstances we will concede *arguendo* there might be substance to this defense."

In the American Sash & Door Company, case, we also quoted from and approved the Detroit Piston Ring Company case, in which the Michigan Supreme Court said:

"A depositor may not sit idly by, however, after knowledge has come to him that his funds seem to be disappearing or that there may be a leak in his business, and refrain from taking steps that a careful and prudent business man would take in such circumstances, and which if taken, would result in stopping the issuance of fraudulent checks. If he fails to take such steps, the facts may establish his negligence in the eyes of a jury; and in that event he would be precluded from recovering against the bank." (This case

was sent back for a jury trial on the issue of "just when, if at all, sufficient knowledge was brought home to them to have caused a prudent business man to check his expenditures.")

There certainly must come a time in a series of forgeries, when obvious suspicious circumstances will so clearly mean to reasonable men that there is something wrong, that failure to see what is plainly to be seen with reasonable care should be held to have the same legal effect as knowledge. In Prudential Ins. Co. v. National Bank of Commerce (N. Y.), 125 N. E. 824, 15 A. L. R. 146 (decided under the rule of the Uniform Negotiable Instruments Act), there was a long series of forgeries of endorsements on its checks by a branch office manager of the company. The court held that the bank's evidence made a jury question on the issue of whether the company's negligence ("in failing to compare the endorsements on the checks which had been returned to it by the defendant, and other banks, with the genuine signatures of the payees in its possession," when all these checks had also been endorsed by its defrauding agent) "contributed to the payment of said checks by the defendant bank." The court said:

" 'Verification of the returned checks would not prevent a loss by the bank in the case of the payment of a single forged check, and probably not in many cases enable the bank to obtain a restitution of its lost money. It would, however, prevent the successful commission of continuous frauds by exposing the first forgeries. . . .' The reason given for not extending the rule to include an examination of indorsements for the purpose of determining whether they are genuine is that the depositor has no greater knowledge on the subject of the genuineness of the signature of the payee than the bank. In the case now before us the plaintiff had in its possession the genuine signatures of each of the payees in the several checks, whose names were forged by Eaton. Whether the plaintiff exercised reasonable care in examining the checks returned as vouchers by the defendant is a question of fact."

We think that the facts shown by defendant's evidence, applicable to the last 25 counts in this case, were sufficient to make a jury case on the issue of negligence, "such as relates to the forgery or its detection," contributing to the payment of the checks by the bank, and being conduct such as to "in effect amount to a representation operating as an estoppel." In the first place, the annual audit of the plaintiffs' books for income tax purposes was completed in March, 1929, and showed that a large shortage existed somewhere. A trial balance of the book kept by Meyer would have immediately located a very substantial part of such shortage. A comparison of books would have shown that Meyer had never entered these fifteen checks in his book. Furthermore, any kind of an examination of the fifteen checks, which had been returned before the last 25 were cashed,

or of the books in which these had been entered, would have shown that about twice the usual number of checks, for about twice the usual amounts, had been issued to Duvall and North each month for a period of five months. (Certainly plaintiffs' head bookkeeper' had this knowledge.) A comparison of the endorsements on these checks with the genuine endorsements of Duvall and North, which plaintiffs had on many checks in their files would have disclosed these to be forgeries. Moreover, even a casual glance at the backs of these checks would have disclosed that for three months these unusual checks (in numbers and amounts) had been coming through both the Gingham Inn and Meyer and that some before that came through Meyer. Plaintiffs must have known that they had carelessly violated their own safety rules in signing the first checks brought to them by Meyer without requiring the bills to be attached and without even examining the checks. With knowledge of a shortage and other suspicious circumstances, they continued to do so. They finally did discover the forgeries by finding these unusual checks in September, 1929. Why could not a jury reasonably believe that but for inexcusable negligence they must have known of them by April? In view of all these matters and considering what the evidence shows as to plaintiffs' knowledge of Meyer's financial condition and his very extensive and expensive outside operations, we hold that a jury could properly find from all these facts that defendant's negligent conduct prior to April, 1929, and thereafter did "in effect amount to a representation" that checks to such payees (with whom plaintiffs regularly did business) endorsed with the names of Meyer and the Gingham Inn, and coming through the Gingham Inn account in the Mercantile Trust Company, were proper charges against its account; that this directly affected the conduct of the bank and contributed to the payment of these checks by it; and that this should operate as an estoppel by which plaintiffs were "precluded" from setting up the defense of forgery of endorsements on checks cashed with such endorsements after March, 1929.

It is further contended by plaintiffs that defendant's Instruction No. 4, authorizing a verdict for defendant on the last 25 counts is erroneous. It is urged that this instruction improperly commented on the evidence and pleadings and that it was argumentative and misleading. As to these and other contentions about this instruction, we adopt what is said, applicable thereto, in the divisional opinion (without quotation marks) as follows:

Instruction No. 4 covered the last twenty-five checks and directed a verdict for defendant thereon if the jury found the facts hypothesized relative to Meyer's embezzlement, his re-employment, his keeping of the landlord's ledger and assisting in reconciling returned checks, his purchase and improvement of the Inn, his difficulty in meeting his obligations, and plaintiffs' knowledge thereof; and fur-

ther that Scott signed said twenty-five checks without inquiry; that Meyer had previously forged the payees' names to the first fifteen checks and failed to enter them in the landlord ledger, causing that book to be out of balance with the other books in plaintiffs' office; that a trial balance of the landlord ledger could have been taken in a short time and compared with a trial balance of the other books; that if such had been done it would have revealed a discrepancy of the amount of the prior forgeries; that cancelled checks were returned by defendant about once a month; that seven of the first fifteen checks were endorsed "Gingham Inn, L. J. Meyer;" that in March, 1929, plaintiffs concluded an audit of their assets and liabilities which showed a shortage of several thousand dollars in their assets and made no attempt to locate the source of the shortage; that an investigation would have resulted in discovery of part or all of the prior forgeries and the discharge of Meyer; that by investigation plaintiffs would have discovered said prior forgeries in reasonable time to have notified defendant thereof before it honored said last twenty-five checks; and that if it had been so notified it would not have honored said checks. Said Instruction 4 contained the further direction to the effect, that if defendant was found to have been negligent in honoring any of said checks, the verdict should be for plaintiffs as to any check so negligently paid.

Instructions to juries must be read and construed together and, as a whole, as stating the law for the guidance of the jury. They must not be conflicting, but may be supplementary to or explanatory of each other. By instructions given at plaintiffs' request, the jury was told, among other things, that:

By Instruction 1, ". . . you have no right to indulge in conjecture or speculation not supported by the evidence. You are not to consider questions of negligence other than those submitted to you in these instructions;"

By Instruction 5, that the defense of plaintiffs' negligence was not made out unless "there was negligence by plaintiffs concerning such checks, or any of them, of such nature as to interfere with the defendant bank's performance of its duties pertaining to the payment of said checks, or any of them, inducing defendant bank to pay such checks, . . . although the endorsements were forged, and unless . . . such negligence . . . was and constituted the direct and proximate cause of the payment. . . ."

By Instruction 8, that if defendant bank paid the checks relying upon prior endorsements and the guaranty thereby of the genuineness of the payees' endorsements and not by reason of plaintiffs' conduct directly and proximately causing defendant to honor the checks, the verdict should be for the plaintiffs. Other instructions for plaintiffs put the burden of proof on defendant to prove its affirmative defense in the nature of estoppel. Reading the instructions as a

whole we do not believe they were conflicting or that the jury would have been misled.

■ It is further argued that defendant's Instruction 4 is wrong in theory because in violation of the rule that a depositor is not obliged to examine the endorsements on his returned checks and that it is based upon the theory that plaintiffs should have discovered, prior to April, 1929, the prior forgeries and should have notified the bank thereof. It is true, as a general rule, that a depositor is not obliged to examine the endorsements on his returned checks. [See American Sash & Door Co. case, supra.] In that case, as we have shown, it is suggested that under certain exceptional circumstances the rule will not apply with unrestricted force,—in other words, circumstances are there stated which may constitute an exception to the general rule. In the instant case plaintiffs' attention had been called by their audit to the fact that there was an apparent shortage in their assets. Hortleder testified that if he had examined the endorsements on the returned checks and seen Meyer's name and signature thereon he would have reported the fact to plaintiffs. Doubtless such information would have led to discovery of the prior forgeries. But without holding that failure to examine the endorsements or to discover the prior forgeries would alone be sufficient to estop plaintiffs, we deem it sufficient to say that those were only part of the facts submitted by said Instruction 4. It hypothesized numerous facts, herein set out, in the conjunctive, all of which had to be found by the jury in order to return a verdict for defendant. We must presume, from the verdict, that they were all found in defendant's favor. Our conclusion is that there was no prejudicial error in the submission of the last 25 counts. There are assignments as to ruling on evidence but we find them to be without merit.

As to counts 1 to 15 inclusive, the judgment for defendant on each count is reversed and remanded with directions to enter judgment for plaintiffs for the amount of the checks sued upon and described in each with interest at 6 per cent from November 1, 1929.

As to counts 16 to 40 inclusive, the judgment for defendant on each count is affirmed. All concur, except *Lucas, J.,* not sitting.