### LIBERTY MUTUAL INSURANCE COMPANY V. FIRST NATIONAL BANK IN DALLAS

No. A-3266. Decided December 12, 1951.
Rehearing overruled January 30, 1952.
(245 S. W., 2d Series, 237.)

*Brundidge, Fountain, Elliott & Bateman,* of Dallas, for petitioner.

It was error for the Court of Civil Appeal to hold that petitioner, by making claim against the Fidelity and Deposit Company of Maryland, its insurer against loss on account of the dishonest acts of its employee, had elected between inconsistent remedies. Slay v. Burnett Trust, 143 Texas 621, 187 S. W. 2d

377; Crutcher v. Eaves, 259 S. W. 970; Browne v. Fidelity & Dep. Co., 98 Texas 55, 80 S. W. 593.

*Coke & Coke, Thomas G. Murnane,* all of Dallas, for respondent.

The Court of Civil Appeals, by its holding, did not restrict plaintiff in its right of contract but correctly held that nothing survived to pass by the instrument executed between the insurer and its customer. Baylor Univ. v. Bradshaw, 84 S. W. 2d 703; Thrower v. Brownlee, 12 S.W. 2d 184; Seamans Oil Co. v. Guy, 276 S. W. 424.

MR. JUSTICE CALVERT delivered the opinion of the Court.

The controlling facts in this case are relatively few and simple. Liberty Mutual Insurance Company—hereafter referred to as Liberty Mutual—had in its employ as its claims manager and adjuster in its Ft. Worth office from December 16, 1946 to March, 1949. one Willard Hill. During this same period Liberty Mutual had an account in First National Bank in Dallas—hereafter referred to as Bank—and carried with Fidelity & Deposity Company of Maryland—hereafter referred to as Fidelity—a policy insuring it against loss sustained by reason of the dishonest acts of its employees. Over the period Hill illegally obtained the sum of $13,209.37 by inducing Liberty Mutual to issue and deliver to him its checks payable to fictitious claimants—some non-existent and some existent but to whom Liberty Mutual was not indebted—in settlement of fake claims, which checks were endorsed by him with the names of fictitious payees and cashed. Checks in the sum of $6750.86 were drawn on Bank and upon being received in due course of business were honored and charged by Bank against Liberty Mutual's account. Upon discovery of its employee's fraud, Liberty Mutual made claim against Fidelity, and, coincident with payment of its claim, assigned to Fidelity its cause or causes of action against all depository banks to require that debits against Liberty Mutual's account, based on such checks, be eliminated, that proper credits be made, or that money equal to the amount of such checks be paid over. Suit in Liberty Mutual's name was authorized. Pursuant to the terms of the assignment this suit against Bank was instituted in the name of Liberty Mutual. Prior endorsers were brought into the suit by Third Party and Fourth Party actions over.

Bank's principal defense and that upon which the trial

court's judgment in Bank's favor was affirmed by the Court of Civil Appeals was that by pursuing its remedy against Fidelity, Liberty Mutual had made an election between inconsistent remedies thereby extinguishing its cause of action against Bank, leaving it with no cause of action to assign. 239 S.W. 2d 738.

Other defenses urged by Bank—and urged here as independent reasons for affirmance of their favorable judgment—were: (1) That Liberty Mutual's loss resulted directly and primarily from its own negligence in failing to provide itself with a better system for supervising the activities of Hill and in failing to sooner discover that the checks were being charged to its account; (2) That since Hill knew the payees in the various checks were fictitious persons the checks were, in fact, payable to bearer and Bank was therefore not liable; and (3) That the cause of action was barred in one year by Article 342-711, or, in the alternative, that it was barred by Article 5526 as to all checks paid and charged against Liberty Mutual's account more than two years prior to the institution of suit. We shall first dispose of these contentions.

1 The burden of respondent's first contention is that since the record reflects that no periodic check of Hill's activities was made by other officers or employees of Liberty Mutual and no evidence was offered to show that monthly statements and cancelled checks were examined for forged signatures of fictitious payees, there is evidence to support an implied finding by the trial court that Liberty's Mutual loss was caused by its own negligence. In support of its contention respondent relies chiefly upon the opinion of this Court in the case of Strickland Transportation Company v. First State Bank of Memphis, 147 Texas 193, 214 S.W. 2d 934 and a number of cases decided by the courts of other states. Although there is perhaps language in the opinion in the Strickland case which would seem to hold Liberty Mutual responsible in this case for its own loss by virtue of its negligence, the facts in the two cases are obviously distinguishable. The holding in the Strickland case is limited to the facts there involved. The reasoning of the courts in the cases from other states might be persuasive if the question had not been decided and set at rest in this state. In its opinion in the case of Liberty State Bank et al v. Guardian Savings & Loan Association, 127 Texas 311, 94 S. W. 2d 133, this Court held that the depositor was under no duty to examine the signatures of payees appearing on his cancelled checks and drafts and that his failure to discover that signatures of payees had been forged would not constitute negligence. See also Green-

ville National Exchange Bank et al v. Nussbaum et al, Tex. Civ. App., 154 S. W. 2d 672, 678, 680 (Ref. W.O.M.) and Republic National Bank of Dallas et al v. Maryland Casualty Co. et al, Tex. Civ. App., 184 S. W. 2d 496, 499 (no writ hist.).

Moreover, there is no evidence here that greater diligence would have led to an earlier discovery of the fraud. The testimony of Hill—the only testimony on the question—was to the effect that the files had been so cleverly faked that an examination thereof would not have brought to light the spurious nature of the claims. Not knowing the signatures of the various payees in the checks an inspection of the cancelled checks would not have reflected the forged endorsements. We do not agree with respondent that the judgment, in its favor can be sustained on this ground.

2 Neither can we agree that respondent was relieved of liability under its implied contract with petitioner on the ground that the checks, having been made payable to fictitious payees with the knowledge of Hill, were payable to bearer. Respondent's contention seems to be founded upon paragraph 3, section 9, Article 5932, V.A.C.S., which provides that an instrument is payable to bearer "when it is payable to the order of a fictitious or non-existing person, and such fact was known to the person making it so payable." There is no evidence here that Liberty Mutual, the nominal drawer of the checks, knew that the checks were payable to fictitious persons. Neither is there any evidence that the employee actually signing the checks knew that they were payable to fictitious persons. But respondent contends, in effect, that Hill was actually the person making the checks payable to fictitious persons since the writing of the checks by a minor employee was but a mere formality attendant upon Hill's requisition. It is then contended that by the language of the Article above quoted it is the knowledge of Hill, "the person making it so payable", and not the knowledge of Liberty Mutual, the nominal maker or drawer, that determines the character of the checks. There is a division of authority on the question of whether under the statutory language above quoted the character of commercial paper payable to the order of a fictitious person is determined by the knowledge of the nominal maker or drawer or by the knowledge of the signer of the paper. See 10 C. J. S. p. 580, Sec. 129. There is respectable and well reasoned authority supporting the view that the knowledge of the nominal maker or drawer controls (Seaboard Nat'l. Bank v. Bank of America, 193 N. Y. 26, 85 N. E. 829, 22 L. R. A.,

N. S. 499; American Sash & Door Co. v. Commerce Trust Co., 332 Mo. 98, 56 S. W. 2d 1034 ["Obviously it is the intention of the responsible creator of the paper which governs"] ; Home Indemnity Co. v. State Bank of Fort Dodge, 233 Iowa 103, 8 N. W. 2d 757; 7 Amer. Jur., p. 839, Sec. 95, p. 844, Sec. 102) ; although perhaps the weight of authority supports the view that the knowledge of the actual signer controls. Mueller & Martin v. Liberty Ins. Bank. 187 Ky. 44, 218 S. W. 465; Union Bank & Trust Co. of L. A. v. Security-First Nat'l. Bank of L. A., 8 Cal. 2d 303, 65 P. 2d 355; Britton on Bills & Notes, p. 699; Beutel's Brannan Negotiable Instruments Law, 317-329. The precise question has not been decided in this State and we find it unnecessary to decide it now, for Bank cannot prevail on its defense even under the theory it has adopted. Hill was not "the person" making the check "so payable" within the meaning of the Act. The idea that he was because the actual signer of the checks was subservient to Hill's orders and was therefore but an automaton or an instrument through which Hill acted is not without force, but the identical idea was rejected by the Supreme Court of Iowa in the case of Home Indemnity Co. v. State Bank of Fort Dodge, supra, where it was contended that the actual signer "was but an automaton, a mechanical device, or marionette, as it were, without mind or intention, operated by Noland." It is also rejected here. A good reason for its rejection is suggested in Beutel's Brannan Negotiable Instruments Law, Seventh Edition, p. 317, where it is said that "any attempt to decide how far" the singer "uses his mind in examining the payee's name on a check and how far he uses his hand only would lead to endless fine distinctions."

**3**  Respondent's third contention raises the question of the applicable period of limitations within which a cause of action such as is involved here shall be asserted. Respondent says that the one-year period set up in Article 342-711, V.A.C.S. is applicable, and, in the alternative, that the general two-year period set up in Article 5526, V.A.C.S., is applicable. On the other hand, petitioner contends that by virtue of the provisions of Article 342-707, V.A.C.S., the general four-year period set up in Article 5527 is applicable. Prior to enactment in 1943 of the Texas Banking Code, of which Articles 342-711 and 342-707 are a part, the general two-year statute rather than the general four-year statute was held to be applicable to causes of action of the character asserted here. Howell v. Nat'l. Bank of Commerce et al, Tex. Civ. App., 181 S. W. 2d 837 (no writ hist.) ; U.S.F. & G. Co. et al v. First Nat'l. Bank of El Paso,

Tex. Civ. App., 93 S. W. 2d 562 (writ dism. by agreement);
Republic Nat'l. Bank et al v. Maryland Casualty Co. et al,
supra.

Article 342-711 provides in part as follows:

"* * * No depositor shall be permitted to dispute any charge
to his account on the ground that the same is based upon a
forged, unauthorized, raised or altered item unless, within one
(1) year from the time check was paid, he shall notify the
bank in writing that the item in question is forged, unauthor-
ized, raised or altered."

Article 342-707 reads as follows:

"The contract of deposit between a bank and a depositor,
whether evidenced by deposit tickets or otherwise shall be
deemed a contract in writing within the purview of Article
5527 of the Revised Civil Statutes of Texas. The cause of action
on any such depository contract, other than a time deposit,
shall not accrue until the bank has denied liability and given
the depositor notice thereof. Provided that the delivery to the
depositor of a statement of his account or pass book reflecting
the balance, or the mailing of a statement of such account (with
or without cancelled items) to the depositor at his address as
reflected by the books of the bank, shall constitute a denial of
any liability on the part of the bank in excess of the balance
reflected by such statement or pass book, and notice thereof
to the depositor, and, to the extent of any excess over the bal-
ance reflected shall accrue the cause of action."

4. Respondent contends that the checks here involved were
"unauthorized" items within the meaning of Article 342-711
and that if that be not true nevertheless there is no such evi-
dence of a contract in writing as is required by Article 342-707
to make its provisions applicable. We cannot accept respon-
dent's theory that the checks here involved were "unauthorized"
items within the meaning of Article 342-711. A reading of that
Article clearly indicates to our minds that it was the intention
of the legislature in the enactment thereof, in the absence of
of notice, to bar within one year causes of action founded upon
infirmities in cancelled items which are discoverable upon ex-
amination. A diligent depositor can be expected to discover
that the maker's name is forged, or that the amount in the
instrument has been raised, or that the instrument has been
altered either as to amount or otherwise, but he cannot be ex-
pected to discover from the cancelled items themselves that

the names of payees are fictitious or that the endorsements of such payees have been forged. We believe the word "unauthorized" as used in Article 342-711 was intended to refer to such items as those drawn in the name of the depositor as maker by an agent having no such authority. This type of infirmity in an instrument can be detected through examination by the depositor. This identical question was the basis of a similar holding by the U. S. Circuit Court of Appeals for the Fifth District in the case of U.S.F. & G. Co. v. First National Bank in Dallas, Texas, et al, 172 Fed. 2d 258. Since the one-year period provided by Article 342-711 is not applicable, the two-year period provided by Article 5526 is applicable just as it was before the enactment of the Banking Code unless by the provisions of Article 342-707 the four-year period provided in Article 5527 is now applicable. It is our opinion that this is the precise type of cause of action to which Article 342-707 was intended to apply. Prior to the enactment of the Code the courts passing on this question held the cause of action to be one to enforce an implied contract and therefore one for money had and received rather than one on a written contract, Howell v. National Bank of Commerce et al, supra, but one of the main reasons for this holding was that there was in fact no written contract between the bank and the depositor upon which suit could be brought. The provision of Article 342-707 now is that the contract of deposit "whether evidenced by deposit tickets or otherwise shall be deemed a contract in writing within the purview of Article 5527." In other words, the courts having held that there was no contract in writing upon which suits such as this could be brought, the legislature has, with knowledge of such holdings, provided the parties with a contract in writing within the meaning of Article 5527. The four-year statute of limitations, as set in motion by Article 342-707, is applicable to the cause of action asserted by petitioner in this case.

5   As was indicated at the beginning of this opinion none of the foregoing questions were discussed or decided by the Court of Civil Appeals. That court's affirmance of the trial court's judgment in respondent's favor was rested solely upon respondent's defense of election of remedies. In deciding that issue in respondent's favor the Court of Civil Appeals followed what appears to be the majority rule in those jurisdictions in which the question has been decided and rested its conclusion upon the same theory and reasoning that is found in all the decisions with which it is in harmony. This theory can best be shown

here by quoting from the Court's opinion. The Court said (239 S.W. 2d 739);

"* * * Under the doctrine of election of remedies it has been held by some courts that in a case like the present one, where an employee covered by a surety bond has forged endorsements on checks issued by the employer, the employer has a choice of remedies which he may pursue. Either he may demand payment of the amount of the checks from the drawee bank, on the theory that when the bank paid the checks on the forged endorsements it paid out its own money, and not that of the depositor, or he may affirm the action of the bank in paying the money on the forged endorsement, and on the ground that the employee embezzled money belonging to the employer, collect on the employee's surety bond. The first remedy is based on the idea that the employer's money is still in the bank, and that the bank must pay it over on demand. The second remedy is based on the idea that the employer's money came into the hands of the employee and was embezzled by the employee.

"* * * To our way of thinking, the more reasonable thing to say under the facts of the present case is that appellant, the employer, after treating the money paid out on the checks as belonging to appellant, in order to get at the surety company, and after collecting from the surety company on the ground that it was the employer's money, and not that of the bank, which had been embezzled by the employee, may not now be allowed to reverse its position and claim that its money is still in the bank. It is inconsistent for appellant to take the position as between it and the fidelity surety that the money was obtained from the bank and embezzled by the employee, and to claim as between it and the bank that the money is still in appellant's account in the bank."

There are no Texas cases precisely in point. The majority opinion in the case of U.S.F. & G. Co. v. First National Bank in Dallas, Fifth Circuit, 172 Fed. 2d 258, arising in Texas, supports the holding of the Court of Civil Appeals. There is in that case a strong dissent on the point discussed.

The contrary view and the theory upon which it rests is well presented by the opinion of the Supreme Court of Pennsylvania in the case of Grubnau v. Centennial National Bank, 279 Pa. 501, 124 Atl. 142 from which we quote:

"The bank received plaintiff's money for deposit, which it was under contract to return when called for. In honoring the

forged check it used its own money, not the depositor's, Grubnau's. The insurance company indemnified the legal plaintiff against misconduct of its agents. Grubnau's legal status was not that of the holder of a claim against two indemnitors, where payment of damages by the one may be offset in a suit against the other. It was a claim against, first, an insurer; second, a company refusing to pay money in violation of the terms of its contract. The remedies cannot, surely, be considered in the same right. The insurance was not in case of the bank's mistake. It would be a novel proposition to hold that an insurance contract could reach out to indemnify a stranger, in no way a party to the insurance, whose wrongful act caused the insurance company to pay loss to the insured which would not have occurred but for the wrongful act. Such protection would be given without cost or contractual relation, merely because the person wronged chooses to collect from the insurance company first, rather than the bank which afterwards disputed the claim on this and other grounds connected with the forged check.

"As to Grubnau's deposit, the wrongdoer was the bank in placing and maintaining a forged check as a credit against Grubnau's account. Whatever may have been the legal relations between the insurance company and Grubnau, they did not affect the debt owed by the bank to its depositor. The use plaintiff, the insurance company, is now suing on an assignment of that debt or right in the legal plaintiff to collect from the bank its deposit. While ordinarily a double recovery for the same loss should not be permitted (and here it is not), the claim under which such rule is enforced must be in the same right—so interrelated that a recovery from the one effects a hardship on the other which would not occur except for the recovery. No hardship was occasioned the bank by the insurance company paying. It has in its possession $4,000 of Grubnau's money; it ought not to be a hardship to give it back.

"* * * Indeed, so far as the bank is concerned, we do not understand how it would be in a position to hinder Grubnau from following both remedies, regardless of supposed inconsistency of demand; nor are we sure the policy does not cover the precise misconduct here practiced. Had the insurance company permitted plaintiff to use both remedies, assuredly the bank could not have complained. If the insurance company had presented the money to Grubnau as a gift because of Healey's act, the bank could not have taken advantage of it. If there was an election to be made, the insurance company was to make it. Instead of sending the parties to court to establish loss, it took

over what might have been a debatable claim through purchase and assignment. The rights are not inconsistent, in that they are of the same quality or cover the same subject-matters."

It is our considered opinion and judgment that the reasoning of the Pennsylvania Court in the Grubnau case is the stronger and more logical reasoning and that it furnishes a sounder basis for our decision in this case. There is but little that could or should be added to the Grubnau opinion in support of our decision here. It has been said that the doctrine of election of remedies is not a favorite of equity and that its scope should not be extended. Slay et al v. Burnett Trust et al, 143 Texas 621, 187 S.W. 2d 377,393. Generally speaking, those courts which deny to a surety the right to enforce the depositor's cause of action against a bank do so on the theory that the surety stands in the shoes of the depositor and that the depositor, having pursued its contract right against and collected from the surety, cannot proceed against the bank because a recovery there would allow the depositor a double recovery. There can be no such double recovery in this case because Fidelity is the beneficial plaintiff. Again it is sometimes said that having processed against the surety the depositor is estopped to proceed against the bank. Estoppel in a case like this presupposes prejudice to the bank. Any right that Bank had here cannot have been prejudiced by Liberty Mutual's collection from Fidelity. Bank continues to urge against Fidelity's suit all the defense it had against Liberty Mutual and it still has the same right it always had to seek recoupment from prior endorsers or to pursue its remedies against the defaulting employee.

Those courts which hold that the depositor by collecting from the surety has made an election between inconsistent remedies must find something inconsistent in the right of the depositor to proceed against both the surety and the bank. The inconsistency, they say, is this: That when the depositor seeks to collect from the bank it must say that the bank paid out its own money and still has the depositor's money in the bank, and that when it seeks to collect from the surety it must say to the surety that the bank paid out the depositor's money thereby causing the depositor a loss. A careful analysis of the relationship of the parties fails to satisfy us that this inconsistency actually exists in the position of the depositor. The indemnity policy does not insure the depositor against loss through the acquisition by an employee of depositor's money. It insures the depositor against loss sustained by reason of the dishonest acts

of the employee. The dishonest acts of the employee here were in his fraudulent procuring of depositor's checks payable to fictitious payees, the forging of the names of the payees and the cashing of such checks. But if the sequence of events had stopped at that point depositor would have suffered no loss though the dishonest employee would have benefitted by ill-gotten gain from his dishonest acts. Depositor did not even suffer a loss when Bank honored the checks and paid them. Depositor's loss occurred only when Bank charged the checks against depositor's account without legal right to do so and in breach of its contract. Accordingly, the position of depositor in making claim against Fidelity was that by virtue of the dishonest acts of depositor's employee Bank had been led to pay out its own money but that Bank had unlawfully and wrongfully charged the amount against and deducted the same from depositor's account thereby causing it a loss. Until Bank could be compelled to restore the account to its proper status Liberty Mutual had suffered a loss. This position is wholly consistent with the position taken with Bank to the effect that it had paid out its own funds and not those of Liberty Mutual.

Insofar as the judgments of the Court of Civil Appeals and of the District Court deny to plaintiff, Liberty Mutual Insurance Company, a recovery against defendant, First National Bank in Dallas, and to third party plaintiff, First National Bank in Dallas, a recovery over against third party defendant, The First National Bank of Fort Worth, Texas, and to fourth party plaintiff, The First National Bank of Fort Worth, Texas, a recovery over against fourth party defendants, Henry Merino and Walter Jarvis, such judgments are reversed, and, based upon the stipulations of the parties, judgment is here rendered as follows:

It is adjudged and decreed that Liberty Mutual Insurance Company, plaintiff, do have and recover of and from First National Bank in Dallas, defendant, the sum of $6750.86, together with interest thereon at the rate of 6% per annum from November 9, 1950, until paid.

It is further adjudged and decreed that First National Bank in Dallas, third party plaintiff, do have and recover of and from The First National Bank of Fort Worth, Texas, third party defendant, the sum of $6750.86, together with interest thereon at the rate of 6% per annum from November 9, 1950, until paid.

It is further adjudged and decreed that The First National Bank of Fort Worth, Texas, fourth party plaintiff, do have and recover of and from Henry Merino, fourth party defendant, the sum of $6005.15, and of and from Henry Merino and Walter Jarvis, fourth party defendants, jointly and severally, the sum of $562.08, together with interest thereon at the rate of 6% per annum from November 9, 1950, until paid.

Insofar as the judgments of the Court of Civil Appeals and of the District Court deny to The First National Bank of Fort Worth, Texas, fourth party plaintiff, a recovery over against Shamrock Liquors, Inc., fourth party defendant, both judgments are affirmed.

All costs in the trial and appellate courts shall be charged against First National Bank in Dallas, The First National Bank of Fort Worth, Texas, Henry Merino and Walter Jarvis, and as between all such parties the costs shall follow the judgment.

Opinion delivered December 12, 1951.

Rehearing overruled January 30, 1952.